Argued and submitted May 24, 2000, affirmed July 25, 2001

In the Matter of
Sequoia Mae Campbell Roche Blum
and Cedar Rain Campbell Roche Blum,
Minor Children.

STATE ex rel STATE OFFICE FOR SERVICES
TO CHILDREN AND FAMILIES,
*Respondent,*

*v.*

DONALD JAMES BLUM,
*Appellant.*

97116J, 98028J;
Petition Nos. 97116J03, 98028J03; A108388

28 P3d 1231

Inge D. Wells argued the cause for appellant. With her on the brief was Wells & Wells.

Michael C. Livingston, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Landau, Presiding Judge, and Deits, Chief Judge, and Wollheim, Judge.

DEITS, C. J.

**DEITS, C. J.**

Father appeals from a judgment terminating his parental rights to his two daughters, S and C. We review *de novo*, ORS 419A.200(5), to determine whether clear and convincing evidence in the record supports the termination of father's rights. We affirm.

Father is a veteran of the Vietnam War, honorably discharged in 1970, who suffers from Posttraumatic Stress Disorder (PTSD). He admits to past use of controlled substances, including heroin, while he was serving in Vietnam, the frequent use of "speed" after returning to the United States, and ten years of alcohol abuse thereafter. He was convicted on drug charges and imprisoned for two years in Missouri in 1989. Within a year of the birth of his first child in 1997, he was arrested twice for assault and once for possession of a controlled substance. He has been hospitalized at veterans' hospitals and received treatment related to his PTSD that involved the use of psychotropic drugs; the extent of that treatment is unknown. Father is not presently employed; he receives a veteran's pension for a non-service-related disability.

Father and the children's mother, Laurinda Shackelford, who are not married, began their relationship in 1994.[1] Shackelford has a history of alcohol abuse, is emotionally and mentally unstable and has engaged in violent behavior. During their relationship, Shackelford has attempted numerous drug treatment programs with limited success. The record indicates that there have been some physical altercations between Shackelford and father. Shackelford testified that, in the past, father has hit her. In one violent incident, father gave her a black eye; in another, he "kind of pounded [her] face into the floor." In December 1997, police took Shackelford and father into custody following an assault in which Shackelford had an open wound on her head. Apparently, Shackelford also has assaulted father. Father stated that, on many occasions, he has had to protect himself from Shackelford.

---

[1] In a separate proceeding, Shackelford stipulated to the termination of her parental rights to the children.

On February 17, 1997, Shackelford gave birth to a daughter, S, at Sacred Heart Hospital in Eugene. S is father's first child. Because Shackelford had admitted to occasional marijuana use, Dr. Joehnk, S's pediatrician, performed a drug screen on the infant that proved negative. Joehnk apparently reported to the State Office for Services to Children and Families (SCF) that the child had been drug screened. On learning of the report to SCF, Shackelford, whose parental rights to an older child, A, had been terminated two weeks earlier, became very upset and, ultimately, struck Joehnk in the face. Father, who was with Shackelford at the hospital, attempted to calm and restrain her. Later, father spoke with Joehnk and pleaded with him to understand Shackelford's emotional background and not to "take to heart what had just transpired."

One or two days later, SCF caseworkers visited Shackelford and father at the hospital and expressed concerns for the safety of S because of Shackelford's inability to care for her older child, A. Among other things, Shackelford was unable to supervise A, had abused alcohol, and had been unable to protect A from a man who was a danger to him. Additionally, Shackelford had tested positive for THC (marijuana) during her pregnancy with S. SCF also was concerned because "[t]he child's father fails to recognize the risk of harm [Shackelford] presents to the child." Three days after her birth, SCF removed S from Shackelford and father's custody.

Shortly after SCF took custody of S, Fellez, an SCF caseworker, prepared a service agreement that prescribed, among other things, that SCF would allow Shackelford and father to visit S a minimum of three times each week. Neither father nor Shackelford would sign the service agreement. In late May of that year, Fellez met with Shackelford and father to discuss services that they and S might need. When Fellez expressed concern about domestic violence, father responded that he did not have any problems and that "that was a one-time thing." Father did not appear to have any concerns about Shackelford's ability to care for S. Father also made it apparent that he and Shackelford did not want anything from SCF, except to have "SCF outta my life and out of our lives." At this meeting, Fellez asked father to sign a release that would allow SCF to review his veteran's records

for the purpose of assessing his mental and emotional condition, and to determine the services that he might require to allow him to function as a parent. Father denied Fellez's request, stating, "I don't feel like my military records should be anybody's business but mine." According to Fellez, the meeting, which began on a positive note, continued to deteriorate until Shackelford and father "both stormed out."

Although he never signed the SCF service agreement, father visited S often from February to August of 1997. Of the 31 visits that one SCF worker supervised, father missed only three scheduled visits. On each occasion that he missed a visit, he appears to have given both notice and an explanation for his failure to attend the scheduled visits. The SCF worker who observed father during these visits testified that he appeared very caring and loving.

While father's interactions with S were generally good, his interactions with Shackelford during those visits were not. Shackelford and father would often fight. During one of the visits, the two engaged in an escalating fight over how best to care for S. At other times, arguments among Shackelford, father, and SCF staff created problems. During one visit, the couple fought because Shackelford wanted to show her "clean UA" report to Fellez, but father did not want her "to give SCF more ammo" to use against them. One SCF worker stated that there were "a couple of times where it would get loud or [where she] felt out of control" and had "to call supervisors or caseworkers." On one occasion, Shackelford attempted to hit one of the caseworkers. In August 1997, at a hearing to determine whether visits should continue, Shackelford "threw something at the judge." At that time, SCF asked the juvenile court to suspend Shackelford and father's visits based on the altercations between Shackelford and father, and those with the SCF staff. The court granted SCF's request and father has not seen his daughter, S, since those visitations were suspended.

On December 27, 1997, Shackelford gave birth to her and father's second daughter, C. Although Shackelford had been under the care of an obstetrician during her pregnancy,

the birth took place at home without the presence of any professional medical personnel. Shortly after the birth, a midwife visited the parents and suggested that Shackelford take C to a doctor "because [the child] was new." Shackelford testified that she would have taken C to a doctor immediately but "I was just not willing to [let SCF] take her at that moment * * * [b]ut on my own, yes I would have taken her to the doctor if I had not had that fear of [SCF] taking her." Two weeks later, an SCF caseworker, Sierzega, accompanied by police officers, went to the parents' apartment to place C in protective custody. During Sierzega's visit, father was "yelling quite a bit" at her and the police, and C lay in a crib next to a dirty diaper. Sierzega later expressed concern that the crib mattress was not covered with a sheet, and that Shackelford was feeding C from bottles that appeared to have been sitting out for some time.

Shortly after SCF took custody of C, father and his attorney met with Sierzega to discuss SCF services and the release of father's veteran's records. SCF contended that they needed to assess father's mental health in order to evaluate his fitness as a parent and his need for treatment. That concern precipitated SCF's repeated requests for father's veteran's records relating to his past mental health care. Further, SCF expressed concerns about father's admitted PTSD and reports of domestic violence between Shackelford and him. At this meeting, SCF told father that his ability to visit the children was dependent upon the release of those records. During the time period leading up to the termination of father's parental rights, SCF made repeated requests for the records, all of which father either denied or ignored.

In February 1998, the juvenile court entered a dispositional order with regard to the older child, S. That order provided that, among other things, Shackelford and father were each to complete a comprehensive psychological evaluation. Father met with Dr. Basham for the evaluation. Basham diagnosed father with: (1) cannabis dependence in early full remission; (2) PTSD; and (3) paranoid personality disorder. It was Basham's opinion that a paranoid personality disorder "frequently does lead to significant impairment of parental functions" and such a parent is "prone to attribute

malicious intent to the actions of children." Basham's report noted that father

> "shows no internal motivation to participate in mental health therapy at this time. His personality disorder is not a condition that is easily treated, primarily due to his lack of realization that it is a problem. His paranoid outlook contributes to the relationship problems between him and [Shackelford] and constitutes a risk factor for functioning as a father to his two children."

As to father's present ability to parent, Basham stated in the report that father "shows a need to participate in a full series of parenting classes, preferably with a 'hands-on' component." Further, Basham opined that father's personality disorder, when combined with his PTSD, "caused him to be a risk for a small child." Lastly, Basham noted that father's relationship with Shackelford exacerbates his mental health problems. After reviewing Basham's report, Sierzega informed father, in a letter, that SCF expected him to complete a drug and alcohol evaluation within 30 days and to obtain a urinalysis within 24 hours, and that failure to meet those conditions could result in the filing of a petition to terminate his parental rights. In response to the letter, father scheduled a drug and alcohol evaluation, but he failed to appear at the appointed time and date.

In December 1998, SCF filed a petition to terminate father's parental rights. At the termination hearing held in August 1999, father testified that he was working to find a home to rent for himself and the children, but that the process of finding a home had been difficult. Father appeared to have no other plan for parenting the children if and when they were reunited with him. At the close of the trial, father testified that he was no longer involved in a relationship with Shackelford, but he believed that they would reunite. At the time of trial, Shackelford and father were expecting their third child. After hearing the evidence, the trial court concluded that clear and convincing evidence supported the termination of father's parental rights.

■ Our task on *de novo* review is to determine whether clear and convincing evidence in the record supports the conclusion that father is presently unfit by reason of conduct or a

condition that is seriously detrimental to the children and that the integration of the children into father's home is improbable within a reasonable time due to conduct or conditions not likely to change. ORS 419B.504. The standard of clear and convincing evidence requires a showing that it is highly probable that father is not presently able, or will not be able within a reasonable time, to meet the physical and emotional needs of the children. *State ex rel Juv. Dept. v. Johnson*, 165 Or App 147, 156, 997 P2d 231 (2000). If that standard is satisfied, we must then decide whether termination is in the children's best interests. ORS 419B.500; *State ex rel SOSCF v. Hammons*, 170 Or App 287, 12 P3d 983, *rev den* 331 Or 583 (2000).

ORS 419B.504 provides a nonexclusive list of factors that the court must consider in determining whether a parent is unfit. The two factors that the trial court relied on in this case were:[2]

"(1)   Emotional illness, mental illness or mental deficiency of the parent of such nature and duration to render the parent incapable of providing proper care for the child for extended periods of time[; and]

"* * * * *

"(5)   Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

In addition to the statutory considerations noted above, SCF advanced, and the trial court relied upon, one additional consideration for determining a parent's fitness: father's failure to present a viable plan for the return of the children to his care.

---

[2] The petition to terminate parental rights made two additional allegations: (1) emotional neglect of the children; and (2) that father's parental ability had been impaired by addictive or habitual use of intoxicating liquors or controlled substances. The trial court held that the state had not proven emotional neglect of the children and, on SCF's motion, dismissed the second allegation.

■     Termination of parental rights is warranted when a mental or emotional illness or disorder renders a parent incapable of caring for his or her children. *See State ex rel Juv. Dept. v. DeVore*, 108 Or App 426, 816 P2d 647 (1991). We have affirmed the termination of parental rights when the parent is diagnosed with a personality disorder, as is the case here, and that disorder makes the affected individual unfit to parent. *See State ex rel SOSCF v. Frazier*, 152 Or App 568, 600, 955 P2d 272, *rev den* 327 Or 305 (1998) (mother's personality disorder and other mental and emotional conditions led to "[t]he termination of mother's rights [that was] also supported, standing alone, by clear and convincing evidence that mother's mental condition rendered her incapable of providing care to her children").

Father does not dispute that he has some mental problems. He contends, however, that the state has failed to prove by clear and convincing evidence that his mental problems render him unfit to parent. He asserts that the only evidence in the record on this issue is a diagnosis of his condition and speculation as to how his condition *might* affect his fitness as a parent. In his view, he has never been given a chance to parent his children and, thus, he has not been shown to be unfit.

As father acknowledges, there is evidence of the diagnosis and a general explanation of his mental abilities. As discussed above, Basham diagnosed father as having PTSD and a paranoid personality disorder. The record indicates that father has been hospitalized in the past for his condition. Basham opined that father's personality disorder is very difficult to treat and that father has demonstrated no desire to seek treatment or to recognize that treatment may be necessary. Basham suggested that such a disorder "frequently does lead to significant impairment of parental functions" and when combined with father's PTSD it can "cause him to be a risk to a small child." Further, according to Basham, with the condition, father would be prone to attribute malicious intent to the actions of children, and is "capable" of responding to a child in a punitive fashion. Finally, he noted that father "is prone to be distrustful of anyone who is part of the 'system,' and it may be difficult for him to engage in treatment in more than a minimally compliant way."

Father is correct that, standing alone, a diagnosis and mere speculation as to how a condition might affect a person's fitness as a parent generally is insufficient to serve as a basis for terminating parental rights. *Johnson*, 165 Or App at 156. Here, however, there is more than a diagnosis and speculation by an expert witness to support the conclusion that father is presently unfit as a parent. There is specific evidence of conduct by father that interferes with his ability to be an adequate parent. There is evidence of abusive interactions, both verbal and physical, between Shackelford and father, as well as evidence of his explosive behavior and refusal to recognize his need for treatment or improvement or to cooperate with SCF's attempts to obtain treatment for him and to facilitate the return of his children. Although there is no evidence that father has acted inappropriately toward either of the children, the statute does not require that abuse of a child actually occur before the termination of parental rights is warranted, if the risk of the parent's unfitness is sufficiently great. *See Frazier*, 152 Or App at 600 (noting that it is not necessary for the state to prove abuse for termination of parental rights).

An additional factor of some importance in this case, which adds support to a finding of father's unfitness, is his failure to comprehend the risk that Shackelford poses to the children. As discussed above, Shackelford is emotionally and mentally unstable. She has been in and out of numerous drug treatment programs. As noted above, she stipulated to the termination of her parental rights to the children in this case; her parental rights to an older child also was terminated because of her inadequacies as a parent. The record demonstrates her inappropriate, neglectful, and sometimes violent behavior. Throughout their interactions with father, SCF staff have expressed concern about father's failure to recognize the risk that Shackelford posed to the children. There is no indication in the record that father has any understanding of the risks posed to the children by Shackelford's behavior. Further, as Basham stated, Shackelford's problems seem to exacerbate father's conditions. Although both father and Shackelford testified at trial that they were not engaged in an ongoing relationship at that time, father stated that he intended to reunite with Shackelford. There is evidence that

they were expecting their third child. We believe, as the trial court found, that it is likely that the two will reunite.

Considering Basham's diagnosis of father's mental condition, his testimony regarding the possible risks to the children from father's condition, the evidence of father's explosive behavior in his interactions with others, his failure to recognize that he has any problems that require treatment or any need for parenting education, as well as his failure to recognize the risks to the children that Shackelford poses, we believe that father's unfitness as a parent has been demonstrated by clear and convincing evidence.

■ The trial court also found that father had failed to adjust his circumstances to make the return of the children possible within a reasonable time. We agree with the trial court that father has not adjusted his circumstances or made an effort to do so. ORS 419B.504(5). After reviewing the evidence in this case, we find that father has had ample opportunity to make changes in his life that would have made the return of his children possible, but that he failed to do so, or even to make an effort to do so. As noted above, father's general response to SCF's concerns about his and Shackelford's fitness as parents was that he needed "SCF outta my life and out of our lives." At trial, father testified:

> "Gee, I don't think there's nothing that SCF can help me with. I don't think I had a problem until you people came into my life."

SCF's request that father take a drug test and enroll in treatment was reasonable. Basham's evaluation noted that determining whether father had a drug or alcohol addiction was the initial first step in evaluating his overall condition.[3] Notably, Basham's evaluation stated that determining whether father had a continuing substance abuse problem was of critical importance because other forms of treatment would likely be ineffective if he continued to use drugs. Here,

---

[3] Specifically, Basham's evaluation recommended:

"[Father] should complete a formal drug and alcohol evaluation that includes the use of urinalysis drug screens, to see if he has a continuing substance abuse problem. [He] should complete any treatment recommended from such an evaluation. If [he] is continuing to use marijuana, it would be important for him to end this before other forms of treatment would likely be effective."

father simply refused to take a drug test. In his early encounters with SCF caseworker Fellez, when asked if he would submit to a drug test, he refused, stating "[m]y views about marijuana [are] not relevant to parenting." Later, SCF arranged payment for drug treatment and, although he was scheduled to enroll, father never attended the treatment program. When advised that failure to complete treatment and to submit to a drug test could lead to the termination of his parental rights, he still failed to meet those conditions.

As discussed above, father also refused to make his military records related to his mental health problems and treatment available to SCF. On appeal, father argues that those records had no relevance to his fitness as a parent and that SCF's, and eventually the court's, continued requests for the records were obsessive and unreasonable. He characterizes this issue on appeal as follows:

> "It appears that the state became focused on Father's unwillingness to release his military records, and refused to allow Father to visit his children, and failed to work with him in any other regard, so long as this release was not obtained."

The trial court found SCF's requests for those records to be important in order to allow an accurate assessment of father's mental condition and its role in his ability to parent his children. Basham noted that having those records would have been helpful in assessing long-term problems because

> "[t]he longevity of the condition is often crucial and if there are prior mental health assessments of any type dating back a period of years, the nature of the problems being seen then [is] very helpful in determining the longevity * * * [and the] nature of such problems."

We conclude that it is unnecessary to determine the significance of SCF's requests for father's military records or father's refusal to provide them. On *de novo* review, we do not consider father's refusal to release his military records as a factor in determining whether termination is appropriate.

■ The evidence in the record also demonstrates that father failed to present a viable plan for the return of the children. The failure of a parent to present a viable plan for the return of a child to that parent's care may be a pertinent factor in determining whether parental rights should be terminated. *State ex rel Juv. Dept. v. Boren,* 105 Or App 599, 607-08, 806 P2d 149 (1991). At the time of trial, it appeared that father's only plan with regard to the children was to search for a home outside of Eugene in which all of them could live. There is no indication of any further plans by father to meet the children's basic needs. Based on all of the above considerations, we conclude that there is clear and convincing evidence that father was both presently unfit by reason of conduct and condition seriously detrimental to the children at the time of trial and that integration of the children into father's home was improbable within a reasonable time.

■ Finally, we turn to the question of whether termination of father's parental rights is in the children's best interests. ORS 419B.500. Father is not amenable to treatment for his personality disorder, he is distrustful of social services, he is unwilling to submit to a drug test or treatment, he is resistant to participation in needed parenting classes, and he does not appear to recognize that he has any inadequacies as a parent; nor did he recognize Shackelford's deficiencies. Unfortunately, it follows that he is unlikely to change. S and C have been in foster care since they were born and have not seen father since January 12, 1998. In view of father's failure to recognize his limitations or to seek treatment, there is no reasonable prospect that the children can safely be returned to father's care in "a period of time that is reasonable given [their] emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419A.004(21); *State ex rel Juv. Dept. v. Geist,* 310 Or 176, 189, 796 P2d 1193 (1990); *Boren,* 105 Or App at 610. We conclude that it is in the best interest of these children that father's parental rights be terminated and that they be freed for adoption.

Affirmed.