Argued and submitted March 11, reversed and remanded July 3,
petition for review denied October 1, 2002 (334 Or 693)

In the Matter of
Jimmy Ward Willis, II, a Minor Child.

STATE ex rel STATE OFFICE FOR
SERVICES TO CHILDREN AND FAMILIES,
*Appellant,*

*v.*

ROBERTA LYNN FARISH,
aka Roberta Lyn Willis,
*Respondent.*

99-010J02; A115713

49 P3d 811

Judy C. Lucas, Assistant Attorney General, argued the cause for appellant. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

James A. Palmer argued the cause and filed the brief for respondent.

Karen S. Torry filed the brief for child.

Before Landau, Presiding Judge, and Linder and Brewer, Judges.

BREWER, J.

Reversed and remanded.

**BREWER, J.**

The State Office for Services to Children and Families (SCF)[1] appeals from a judgment dismissing its petition for termination of mother's parental rights to her now nine-year-old son (child). ORS 419B.500. In a separate judgment, we affirmed without opinion the judgment terminating father's parental rights. *State ex rel SOSCF v. Willis*, 180 Or App 613, 45 P3d 519 (2002). On *de novo* review, ORS 419A.200(3)(c); ORS 19.415(3), we reverse and remand for entry of a judgment terminating mother's parental rights.

Child was born in November 1992; he was eight years old at the time of trial in July 2001. He is the only child of father and mother, although mother has two older children, Nickey and Timothy, who were 18 and 13, respectively, at the time of trial.[2] Mother and father became acquainted through mother's former neighbor, Lenora Davis, with whom father previously cohabited for six years. In 1995, Davis's 14-year-old daughter reported that father had sexually and physically abused her and had forbidden her to tell family members. Davis's daughter repeated those accusations as a witness at trial in this case, but father has not been prosecuted for any offense committed against her.

In September 1997, Nickey reported to a sheriff's deputy that father had been physically abusing her, Timothy, and mother for the past several years. Nickey reported that on various occasions father had slugged Timothy in the jaw, leaving a red mark; blackened Timothy's eye; and bent his fingers back until he cried. According to Nickey, it did not help to tell mother about the abuse, because she was usually intoxicated and would support father's denials; then it would be "worse" for the children. When the deputy and an SCF worker talked to mother and father about the allegations, both parents denied any abuse, and mother denied having a drinking problem. Father refused to let the worker interview

---

[1] SCF has been subsumed into the Department of Human Services (DHS). Or Laws 2001, ch 900, §§ 1-4.

[2] Nickey and Timothy were wards of the juvenile court at the time of trial; SCF has not sought termination of mother's parental rights with respect to them.

the children alone and told the investigators to leave his property.

On January 21, 1998, Nickey and Timothy reported to authorities that father had thrown a backpack at Nickey, hitting her and injuring her face. A sheriff's deputy photographed Nickey's injury. The parents claimed that the injury was accidental, but mother later told a caseworker that she was "tired of [father] beating on her and the children." Mother signed a safety plan agreement with SCF in which she agreed to support Nickey emotionally and to prevent contact between father and Nickey.

On January 27, 1998, Nickey wrote a letter to SCF describing extensive and escalating abuse that father had inflicted on family members over the previous five years, including many beatings inflicted on her, Timothy, and mother. Nickey described mother's role in the situation as follows:

> "My mom is an alcoholic and [father pacifies] her with beer. I want to stay with my mom if she will get help for her drinking and leave [father]. * * * Some day he will kill one of us. My mom was a beautiful person before the beer and [father]. I think it is time that we are allowed to feel safe, allowed to be children, allowed just to live without the fear * * * [that father] will hurt us. Timmy and I have told our mom about the abuse and were told to shut up and calm down. Or she [would tell father] and he would punish us."

The next day, father tried to intimidate an investigating caseworker, and both parents once again denied that the children had been abused. On January 29, the juvenile department filed a dependency petition with respect to all three children. The court entered a restraining order prohibiting father from entering mother's residence and forbidding father to have any contact with the children. Nickey then went to live with mother's parents, and the boys remained with mother.

Father was arrested for assaulting Nickey, and he was jailed on that charge. On February 9, after his release, father moved back into the residence with mother and the boys, despite the terms of the restraining order and safety

plan. SCF then removed the boys from mother's home and placed them in temporary foster care.

Timothy and child were relocated to their grandparents' home in March 1998. SCF provided mentoring services to assist the grandparents in dealing with conflicts between Timothy and child. In May, the court entered a wardship order for the children and, in June, the parents signed a service agreement. Mother attended weekly supervised visits at the grandparents' home but did not receive overnight visits because she continued to be "unsupportive" of the children's disclosure of abuse. Child's counselor attempted to enlist mother's participation in child's treatment but mother failed to follow through.

Dr. Ewell, a psychologist, evaluated mother in June. He diagnosed mother as having significant intellectual limitations and a personality disorder with dependent and passive-aggressive features. Mother denied any past or current alcohol-related problems, but Ewell believed that mother might have been intoxicated at the time of the evaluation. According to Ewell:

> "[Mother] denied any history of abuse, or domestic violence. She claimed that [father] 'never hits' her, or the children. She considered his disciplining strategies to be highly appropriate. She claimed that SCF workers 'made up stuff' about [father] being abusive. She described Nickey's allegations as 'lies.' "

Ewell recommended that SCF consider outpatient treatment for mother's "chemical dependency." Mother then was evaluated by Willamette Family Treatment, which recommended a 21-day inpatient dependency treatment program, including parent training classes, to be followed by an intensive outpatient treatment program. At intake, mother repeated her denials of alcohol dependency and physical abuse by father but agreed to participate in treatment because SCF required it.

Mother entered residential treatment on August 3 but left the program against staff advice on August 11. Mother was reluctant to take part in further treatment, but she participated in a couple of counseling sessions. SCF's initial goal was to focus primarily—but not exclusively—on

mother's alcohol dependency and then provide additional services aimed at reunifying her with the children. In a review hearing on August 17, the court ordered mother to attend a residential alcohol treatment program specified by SCF.

Meanwhile, the children were having difficulties in their placement with the grandparents. Grandmother had serious health problems, and both grandparents had difficulty supervising child. At one point, grandmother broke her arm while trying to handle him. The grandparents also were unable to adequately address chronic hostility between Timothy and child. In October, grandmother, the children's primary caretaker, suffered a stroke and no longer was able to provide for their care. The children then were placed with mother's sister, Patricia Sirotek, who was certified as a foster parent.

In November 1998, mother was accepted at New Directions, a residential alcohol treatment facility in Baker City. The referring specialist, hired by mother's attorney, opined that mother was a late-stage alcoholic who needed physical separation from father in order to benefit from treatment. With SCF's approval, mother entered New Directions' six-month residential treatment program on November 17. The program included various treatment features, including alcohol and drug classes, parenting classes, group therapy, recreation and art therapy, and AA meetings. Mother's SCF caseworker furnished the treatment provider with a copy of Ewell's evaluation, underscoring the need to work with mother on a one-on-one basis in order to accommodate her intellectual limitations. He wrote to mother on December 14, stressing the importance of her finishing the program as a means of facilitating reunification with her children.

Between November 17 and December 28, mother met twice with the New Directions' staff psychiatrist, and, in addition to group sessions, she also received weekly individual sessions with an alcohol counselor. Mother also had an individual mental health counseling session with a contract service provider. Mother's alcohol counselor testified that mother appeared to understand the information presented to

her but was unwilling to participate in any phase of treatment, whether group-oriented or individualized. Throughout her stay at New Directions, mother denied that father had abused her or the children and maintained that Nickey was a liar. Because mother was not willing to engage actively in treatment, she was terminated from the New Directions program on December 28.

In February 1999, because it believed that the parents had made no progress in the past year towards meeting the children's needs, SCF adopted a permanency plan calling for the grandparents to have guardianship of Nickey and for Sirotek to retain guardianship of the boys. On February 23, father pleaded guilty to criminal mistreatment in the first degree, ORS 163.205, for the January 1998 abuse of Nickey.

Ewell evaluated child in March 1999 and diagnosed child with Oppositional-Defiant Disorder and Adjustment Disorder with mixed disturbance of emotions and conduct. Ewell stated that child "has experienced very little parenting, guidance or nurturing" and that the "nature and quality of his attachments to siblings, parents and aunts/uncles is limited. He seems confused about these issues. Again, he has experienced significant forms of disturbance within his family of origin." Ewell opined that child needed a structured, consistent home environment. Child's counselor offered a similar view. He opined that, if child were exposed further to alcohol abuse or domestic violence, he would suffer further emotional problems. Father had been diagnosed with an antisocial personality disorder and, according to child's counselor, could not be expected to evince empathy for child's plight.

Father's weekly visits with child presented problems. Father would become upset during the visits, generally about guidelines imposed by SCF. In April, he yelled at a caseworker during a visit. In April, a Citizens Review Board report indicated that mother was still living with father, that she denied that he ever had abused the children, and that, although she contended that she had been sober since November 1998, she was not attending AA meetings and was not participating in counseling.

In May 1999, the court held a dispositional review hearing and directed SCF to end the plan for reunification and to implement a plan for relative guardianship or adoption for child. In June, Sirotek asked SCF to remove child from her home due to his behavioral problems, which included an unusual precociousness in sexual knowledge and threats and aggression that were fueled by the types of toys given to him by father. SCF placed child in a new foster home. Child's circumstances improved in the new foster placement with the help of counseling and a behavior support specialist.

On June 2, 2000, SCF decided to pursue termination of mother's and father's parental rights to child. On June 11, father's attorney wrote to SCF, stating that the parents were willing to be separated in order for child to be returned to mother. Also in June, the mother in child's foster family was diagnosed with cancer and child had to be placed in another foster home. Child was experiencing difficulty with impulse control, felt unloved, and did not want to go to counseling because he had to talk about "things he didn't want to talk about." Child's therapist was concerned that weekly visits with his parents might not be appropriate but was unsure whether his treatment results would be better or worse if visits ceased at that point. By September, however, child began to progress in counseling.

In October 2000, the juvenile court relieved SCF of responsibility to unite child with his parents, and, in December, SCF filed petitions for termination of parental rights. At that time, mother continued to reside with father. In February 2001, the juvenile court ordered child's placement in an out-of-state potential adoptive placement and provided for weekly supervised telephone contact with his parents. In April, mother requested increased visitation with child and sought a referral for parenting classes. SCF declined both requests.

In July 2001, Ewell conducted a second psychological evaluation of mother. Ewell found that mother continued to suffer from a personality disorder with dependent and passive-aggressive features. Mother tested at a slightly higher IQ level than that at which she previously had tested, and

Ewell concluded that she now had borderline intellectual functioning. Mother told Ewell that she had been sober since November 1998 and had been denied outpatient treatment because she had been sober for two years. Mother continued to live with father, as she had since he was released from jail in February 1998. Mother was not employed and was financially dependent on father. Mother believed that the children should be returned to her immediately, noting that she and father were getting along well.

Ewell concluded that mother's prognosis for being able to parent child safely was poor. He testified that her personality disorder is a longstanding form of mental disturbance that causes her to have difficulty complying with social norms and expectations. According to Ewell, mother's dependent personality indicates that she is overly controlled by other people, has difficulty asserting herself, and would have a hard time removing herself from dysfunctional situations and living independently. The dependent features of mother's personality were exacerbated by the passive-aggressive features because, even if she disagreed with a situation, she was unlikely to confront the problem effectively. Over time, mother likely would fall into a pattern of not following through with improvement plans when there was no apparent reason for not doing so. Ewell previously had recommended varied services for mother but emphasized that no services would alleviate the risk to child as long as mother continued to reside with father.

In Ewell's view, mother consistently had chosen father over the children. Mother's insistence that Nickey was lying about the abuse, together with mother's low intellectual functioning and unassertiveness, suggested a failure to protect the children. Any course of therapy for mother would, according to Ewell, include at least six to twelve months of intensive chemical dependency treatment. In addition, it would include individual psychotherapy, parent training, and joint counseling with father. Ewell concluded that he "would imagine that course of treatment altogether would need to last well over a year and would need to be intensive and require a great deal of supervision and monitoring and involvement by a variety of professionals, also." Ewell opined

that the prognosis for mother's success in treatment was "poor to guarded."

Ewell also evaluated father in July 2001. From father's point of view, SCF was involved with his family because of Nickey's "lies." Father maintained that, other than accidentally throwing a backpack at Nickey, he had done nothing wrong and denied that he needed any therapy. He denied engaging in any abuse toward mother and stated that he was committed to a long-term relationship with her.

At the time of trial, the parents resided in a studio apartment next to a topless bar. Mother's 71-year-old father testified, however, that he was available as a resource to mother and the children if the court believed that mother and father should separate. Grandfather testified that mother had stopped drinking in November 1998 and was now a model parent. He saw no problems between Timothy and child and believed that mother and the children probably could live together on their own. Grandfather had never spoken to mother or father about father's abuse of Nickey but he believed that both parents should retain their parental rights. Grandfather testified, though, that father would not be permitted to come to his house to visit mother and the children if the court so ordered.

At trial, father repeated his denials that he ever had abused Timothy, and he denied that he had sexually abused Davis's daughter. He asserted that he would separate from mother if necessary but stated that child should be reunited with both parents.

Mother testified that father had never abused her. She testified that she had stopped drinking in November 1998 but had needed more time at New Directions because "there's probably a lot that I didn't understand." Mother denied telling anyone that she was tired of father beating her and the children. She denied telling anyone that Nickey, SCF, or the police investigators were liars. She denied that father had ever physically abused Timothy. Although mother testified that she would separate from father if necessary, she asserted that child could safely be returned to both parents. If that happened, they would live in their current residence until they could get a larger place.

Several witnesses testified that they had not seen mother drink alcohol after November 1998, but two convenience store clerks testified that they believed that mother had regularly bought beer from them since then.

After the trial concluded, the trial court found that father "is unfit by reason of conduct or condition seriously detrimental to the child, and integration of the child into the father's home is improbable within a reasonable time due to conduct or conditions not likely to change," including (1) criminal conduct that impairs father's ability to care for child adequately; (2) conduct toward Nickey of a cruel or abusive nature; (3) conduct toward Timothy of a cruel or abusive nature; and (4) mental, emotional, or psychological abuse of child. Specifically, the court found

"that father engaged in a course of conduct of physical abuse to his two stepchildren and to his wife, who were living with him throughout [child's] life, which took place in front of [child] * * *.

"And that father has not engaged in any services that were even available to him, did not comply with the service agreement and did not adjust his circumstances to allow for * * * [child] to be returned to him."

With respect to mother, the trial court also made extensive findings. The court found that mother had stopped drinking in November 1998, that she had regularly attended AA meetings since December 2000, and that she was very bonded to her children. The court found that mother had attended all the visits that were allowed by SCF. The court also noted that Ewell had recommended that mother receive individual psychotherapy with outpatient alcohol treatment; SCF unilaterally determined that mother required inpatient alcohol treatment that must proceed before other services would be offered. The court also found that grandfather was protective of the children and was a resource. The court found that SCF had failed to show that mother's taking up residence with the children in the grandparents' home would not provide them with "safety and protection." The court found that child was maturing and now could manage his anger appropriately. The court concluded:

"[T]he court is finding that mother * * * is able to minimally, adequately parent on her own. I am requiring initial living situation with grandparents to the extent that there is pending—that mother has that as her plan that she has presented.

"Which is to live there initially until she has the resources to move out on her own. So this is not a grandparent who has guardianship, this is a mother who is parenting based upon mother's plan of initially living or residing with grandparents without father, obtaining her own financial independence.

"But the court finds that mother is able to do this on her own, so it is not conditional."

In the judgment denying termination of mother's parental rights, the court ordered that "SCF shall provide parenting time to mother, and in-person visitation with the child in Oregon. The court recommends placement with the grandparents." The court also directed SCF to develop a service plan designed to "reintegrate the child into mother's home." SCF appeals from that judgment.

 SCF asserts that it presented clear and convincing evidence supporting termination of mother's parental rights on unfitness grounds under ORS 419B.504.[3] In order to terminate parental rights under that section, the court first

---

[3] ORS 419B.504 provides, in part:

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"(1) Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child for extended periods of time.

"(2) Conduct toward any child of an abusive, cruel or sexual nature.

"(3) Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.

"(4) Physical neglect of the child.

"(5) Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make it possible for the child to safely return home within a reasonable time or failure of the parent to make a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

must find by clear and convincing evidence that the parent is unfit because the parent has engaged in some conduct or is characterized by some condition that is seriously detrimental to the child. *State ex rel SOSCF v. Stillman*, 333 Or 135, 145-46, 36 P3d 490 (2001). Second, if the parent is found unfit, the court must also find that the integration of the child into the parent's home is improbable within a reasonable time due to conduct or conditions not likely to change. *Id.* A reasonable period for integration must take account of the child's "emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419A.004(21). *See Stillman*, 333 Or at 146. "That inquiry is child-specific. It calls for testimony in psychological and developmental terms regarding the particular child's requirements." *Id.* Finally, termination may be ordered only if it is in the best interests of the child. ORS 419B.500; *State ex rel SOSCF v. Blum*, 175 Or App 447, 454, 28 P3d 1231 (2001), *rev den* 333 Or 399 (2002).

■ Although our review is *de novo*, "we give 'considerable weight' to the trial court's findings on credibility due to that court's ability to 'observe the witnesses and their demeanor.' " *State ex rel Juv. Dept. v. Proctor*, 167 Or App 18, 27, 2 P3d 405, *adhered to on recons* 169 Or App 606, 10 P3d 332 (2000) (quoting *State ex rel Juv. Dept. v. Geist*, 310 Or 176, 194, 796 P2d 1193 (1990)). In this case, that principle cuts in two different directions. On the one hand, it gives force to the trial court's finding that mother stopped drinking in November 1998—despite the fact that she had failed two alcohol treatment programs in that year. On the other hand, and ultimately more significantly, the trial court's findings that father engaged in an abusive course of conduct toward Nickey, Timothy, and mother also are entitled to considerable weight. Those findings are utterly inconsistent with much of mother's trial testimony. As noted, mother testified that father had not abused Nickey, Timothy, or mother herself. Mother adopted that stance despite father's guilty plea to the offense of criminal mistreatment of Nickey. In light of the trial court's findings as to father's unfitness, it is clear that mother failed to adequately protect child's siblings from abuse—a fact that directly bears on her fitness to parent child. *See State ex rel SOSCF v. Burke*, 164 Or App 178, 188, 990 P2d 922 (1999), *rev den* 330 Or 138 (2000) (holding that a

child need not remain in an environment where siblings have been abused); *State ex rel Juv. Dept. v. Gohranson*, 143 Or App 36, 42, 923 P2d 1259, *rev den* 324 Or 395 (1996) (holding a parent's abuse of any child is relevant in terminating that parent's parental rights).

Clear and convincing evidence, in the form of Ewell's undisputed testimony, also demonstrates that mother's failure to protect her children was the result of her intellectual limitations and one or more personality disorders that render her particularly susceptible to the manipulations of a controlling figure such as father. Mother permitted father to return to the family residence despite the restraining order that the court entered prohibiting him from doing so. The fact that she has lived with father since his release from jail in February 1998 makes unsurprising mother's testimony that child could safely be returned to her *and* father. The record clearly and convincingly demonstrates that mother is unfit by reason of one or more conditions that are seriously detrimental to child. *See Blum*, 175 Or App at 456-57 (determining that the parent was unfit, in part, based on the parent's failure to recognize risk of harm posed to children by the parent's domestic associate). *See also State ex rel Juv. Dept. v. Ricks*, 118 Or App 566, 571-72, 848 P2d 630 (1993) (holding that the mother's refusal to acknowledge the harmful environment created by the father's abuse demonstrated unfitness supporting termination of the mother's parental rights).

The more difficult question is whether child's integration into mother's home is improbable within a reasonable time due to conduct or conditions not likely to change. It is apparent that the trial court answered that question negatively because of two sets of circumstances and concerns: (1) mother loves child and is also a victim of father's abusive conduct, and (2) SCF did not follow Ewell's recommendation in providing mother with an appropriate sequence and array of services. In that vein, the trial court relied on Ewell's first report and trial testimony to infer that alcohol treatment should not have been prescribed independently from individualized psychological treatment.

The first set of circumstances apparently relied on by the trial court is significant, but it carries the analysis only

a limited distance. The problem is that, despite being herself a victim of father's abuse, mother has continued to cover for that abuse and, thus, to take father's side over the welfare of her own children—through the time of trial, more than three years after child was initially placed in substitute care. Moreover, there is no credible evidence that her condition will change within a reasonable time. She was still living with father and maintained her denials at trial. Ewell testified persuasively that, given mother's intellectual deficiencies and psychological disorder, there is no near-term remedy for her condition.

Thus, the issue reduces to the trial court's second concern, namely, whether SCF prescribed an unreasonable sequence and mix of services for mother. Mother's criticism of SCF's decision to prescribe the New Directions residential treatment program, as opposed to an out-patient program, is ill-founded. As noted, in authorizing that program, SCF adopted the recommendation of an expert hired by mother's attorney. That recommendation was based on the expert's opinion that mother was a late-stage alcoholic who needed to separate from father in order to have any reasonable chance at recovery and reunification with her children. It also was approved by the juvenile court. In short, if SCF failed to follow Ewell's initial instinct that outpatient treatment was appropriate, it was at the behest of mother's own expert and with the court's approval. Furthermore, mother did receive some mental health services and individual counseling sessions while in residence at New Directions. Undoubtedly she would have received further services had she actively participated in treatment. Moreover, although Ewell was somewhat surprised that mother had not received individual psychotherapy, he did not testify that SCF followed an inappropriate service plan under the circumstances. In fact, he testified that other professionals might require mother to address her alcohol use *before* she was offered other services. We conclude that SCF made reasonable efforts to provide services that would facilitate the return of child to mother's home.

We turn to the issue of child's best interests. Children have a right to grow up without fear of abuse or neglect. *Geist*, 310 Or at 189. Where a parent has been unable or

unwilling to rehabilitate himself or herself within a reasonable time, despite the provision of a reasonable level of social services, termination is generally in the child's best interests. *Id.* We conclude that that is the case here. Although child is adoptable, his emotional and psychological needs demand stability and permanency, not the doubtful prospects resulting from mother's poor prognosis for achieving a safe reunification.

Reversed and remanded.