Argued and submitted December 9, 2003, affirmed August 25, 2004

In the Matter of
(no first name or middle name) Lee,
aka Emily Grace Lee, aka Emily Lee and
Ayden Michael Lee, Minor Children.

STATE ex rel DEPARTMENT OF
HUMAN SERVICES,
*Appellant,*

*v.*

Jennifer Irene LEE,
*Respondent.*

00-12-30J-03, 01-03-07J-02; A121953

96 P3d 823

Denise G. Fjordbeck, Assistant Attorney General, argued the cause for appellant. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Gay Canaday argued the cause and filed the brief for respondent.

Before Landau, Presiding Judge, and Deits, Chief Judge, and Leeson, Judge pro tempore.

LANDAU, P. J.

## LANDAU, P. J.

The Department of Human Services (DHS) petitioned to terminate mother's parental rights to two of her children, A and E, on the ground that mother was unfit. ORS 419B.500; ORS 419B.504. After a hearing, the juvenile court concluded that DHS had failed to prove the allegations in the petitions by clear and convincing evidence and denied the petitions. DHS appeals. On *de novo* review, ORS 419A.200(6)(b), we affirm.

Mother gave birth to her first child when she was 18. When the first child was approximately three years old, she began living with mother's aunt and uncle and has lived there ever since. Mother gave birth to her second child six years later. Her third child, A, was born two years after that, in October 1999. For the next two or three months, mother, her second child, and A lived with mother's friend Jill Wilson (Jill). Mother, those children, and Jill's adult daughter Elizabeth Wilson (Elizabeth) then moved to an apartment, where mother and Elizabeth Wilson informally coparented the children.

In December 2000, mother's fourth child, E, was born. Based on the concerns of hospital staff about mother's emotional state and her parenting skills, E almost immediately was placed in the temporary custody of DHS. In March 2001, E was found to be within the jurisdiction of the juvenile court, ORS 419B.100, and was placed in the legal custody of DHS.[1]

At about the same time, DHS also obtained temporary custody of A. In June 2001, A was found to be within the jurisdiction of the juvenile court and was placed in the legal custody of DHS. A was approximately 20 months old.

DHS placed the children in the care of Elizabeth, first in the apartment she shared with mother, then in a separate apartment Elizabeth obtained. In September 2001, mother moved from her apartment to a nearby residence.

---

[1] Mother appealed the juvenile court's March 2001 order; this court affirmed without opinion. *State ex rel Juv. Dept. v. Lee*, 181 Or App 467, 46 P3d 229 (2002).

Beginning at the time that E was placed in the temporary custody of DHS, DHS prepared a series of service agreements pursuant to which mother was expected to comply with various expectations and DHS agreed to provide mother with various services. Pursuant to a January 2001 service agreement, mother agreed to participate in a psychological evaluation, a parent-child assessment, and a family assessment, to visit regularly with E, and to maintain stable housing. In return, DHS referred mother for the evaluation and assessments and agreed to be available to her for discussion of the case plan.

In June 2001, mother agreed to participate in ongoing counseling and a family assessment, to "continue to work on stabilizing her housing and financial situation," and to continue with scheduled visitation. DHS agreed to refer mother for family counseling, vocational rehabilitation, and other services designed to assist her in finding employment and housing and agreed to request funding for parent mentor services.[2] The record also contains an unsigned October 2001 agreement requiring mother to obtain stable and consistent employment and housing and to participate in meetings, therapy, job training and visitation, and an unsigned January 2002 agreement according to which mother agreed to obtain stable employment within 30 days and stable housing within 60 days, to participate in required therapy, job training, and visitation, and to obtain prenatal care, and under which DHS agreed to conduct regular visits to mother's home "to ensure progress." Meanwhile, mother became pregnant with her fifth child.

In February 2002, based on Elizabeth's inability to be recertified as a foster care provider, A and E were placed with their current foster parents.

In March 2002, the juvenile court held a permanency hearing, in which it found that DHS had made reasonable efforts to reunify the family and that mother had failed to make sufficient progress toward reunification. The court

---

[2] The January 2001 service agreement nominally addressed the parties' expectations in regard to E. The June 2001 service agreement nominally pertained to mother's parenting of A and mother's second child, who also was in the legal custody of DHS at that time.

entered orders relieving DHS of the obligation to continue its reunification efforts as to A and E, continued custody of the children with DHS, and directed that the agency proceed with termination of mother's parental rights.

In August 2002, DHS filed its petitions for termination of mother's parental rights to A and E. DHS alleged that mother was unfit by reason of conduct or condition seriously detrimental to the children and that integration of the children into mother's home within a reasonable time was improbable due to conduct or conditions unlikely to change. In brief, DHS contended that mother had made no effort to obtain or maintain a suitable or stable living situation for A and E; that she had failed to present a viable plan for the return of the children to her care and custody; that she had failed to learn or assume sufficient parenting or housekeeping skills; that she suffered an emotional or mental illness that rendered her incapable of providing care; that she had made no effort to adjust her circumstances; and that she had failed to effect a lasting adjustment after reasonable efforts by available social agencies. *See* ORS 419B.504(1), (5).

The hearings took place in March and April 2003. We discuss in greater detail the record that was developed at the hearings when we evaluate whether the state proved by clear and convincing evidence that mother is unfit or that termination of her parental rights is in the best interests of the child.

A number of individuals testified at the hearing, including Valerie Mustonen and Nancy Moore, social workers at Oregon Health and Science University Hospital (OHSU), who testified regarding mother's conduct following E's birth; mother's DHS caseworkers, including Stacie Torres, her caseworker from the time of E's birth until June 2001, Roni Goldbeck, mother's caseworker from June 2001 to August 2002, and Rich Steronko, who was the permanency caseworker from August 2002 forward; and Charles Dunn, a DHS social worker who, after mother's fifth child was born in February 2002, facilitated approximately six "family decision meetings" involving mother and members of her "support system." Other social service providers who testified at the hearing included Randi Weber, who, between November

2001 and September 2002, provided mother with therapeutic visitation services involving A and E as well as mother's second child and, eventually, her fifth child; Ruth Waterhouse, who provided self-sufficiency services to mother and her fifth child beginning in approximately March 2002; Sarah Gregg, who provided parent mentoring services to mother in the context of mother's fifth child beginning in mid-2002; and Kathy Kelley, a Clackamas County Public Health (CCPH) community health nurse, who conducted approximately 25 home visits with mother and her fifth child between April 2002 and the hearing.

Several witnesses testified regarding mother's mental health, including Clackamas County Mental Health Clinic (CCMH) counselor Sally Hingley, who provided counseling services to mother on several occasions in 2000 and 2001; a psychotherapist, Deborah Baker, who met with mother two or three times in early 2001 and who prepared a written evaluation of mother; a psychiatrist, Dr. Glass, who evaluated mother in May 2001 and conducted a parent-child interaction in the fall of 2001, as well as reviewing records of mother's previous interactions with mental health care providers; a psychologist, Dr. Colistro, who evaluated mother in September 2002; and Gregg Mulkey, also from CCMH, who provided counseling services to mother from February 2002 until the time of the hearing.

Two physicians—Dr. Telasha, mother's obstetrician for her pregnancy with her fifth child, and Dr. Dana, an oncologist—testified regarding mother's physical health, including her severe anemia, which was diagnosed and treated beginning in October 2002.

Finally, as pertinent here, the juvenile court heard testimony by Billie Bell, who was appointed in October 2001 to act as mother's guardian *ad litem* and who, over the following 18 months, met with mother for approximately 25 to 30 hours; by Jill Wilson, with whom, at the time of the hearing, mother and her fifth child had been living since April 2002; by A's and E's foster parents; and by mother herself.

The trial court concluded that DHS had failed to establish by clear and convincing evidence that mother is unfit or that termination of her parental rights was in the

best interests of the children. Specifically, the court found that, although mother had some longstanding psychological and emotional problems and a history of "disappointing conduct" including habitually being late to and missing appointments, her conduct had improved over time. The court found that she had no problems with housekeeping skills or problems relating to drug or alcohol use and that, during the time that mother was "not showing up for appointments," she had "acute chronic anemia" that had now been treated. The court found that mother's housing situation was stable and adequate for multiple children and that she was "doing well" in her visits with her second child and in parenting her fifth child. The court found that DHS's evidence that mother suffered from a serious emotional or mental illness was not persuasive. The court also found that DHS had failed to perform home visits as required in the service agreements, that its requirement that mother get a job at a time when she was in the late stages of her pregnancy with her fifth child was "unreasonable," and that DHS had failed to assist mother in other ways, including the failure to allow her to have unsupervised visits with A and E. The court noted that it was concerned about mother's lack of a bond with E but that that lack was the result of DHS not allowing an opportunity for the bond to form.

■ On appeal, DHS argues that the trial court erred in finding that it had failed in its proof. According to DHS, the evidence shows conclusively that mother is unfit, that she has not bonded with either child, and that she failed to participate in services or participated at a minimal level. Mother argues that the trial court correctly evaluated the sufficiency of DHS's proof.

■ Under ORS 419B.500 and ORS 419B.504, we apply a two-part test for determining whether to terminate parental rights on the ground of unfitness. First, the state must prove by clear and convincing evidence that the parent is presently unfit by reason of conduct or condition seriously detrimental to the child or children and that integration of the child or children into the parent's home is "improbable within a reasonable time." Second, if the parent is presently unfit and integration is improbable within a reasonable time, the remaining question is whether termination is in the child's or

children's best interest. *See State ex rel Juv. Dept. v. Nguyen*, 182 Or App 294, 304-05, 48 P3d 864 (2002), *aff'd in part, vac'd in part on other grounds*, 335 Or 255, 66 P3d 1025 (2003); *see also State ex rel SOSCF v. Stillman*, 333 Or 135, 145, 36 P3d 490 (2001) (court considers whether integration of child into the parent's home is improbable within a reasonable time only if it determines that parent is unfit by reason of conduct or condition that is "seriously detrimental" to the child). For the reasons outlined below, we agree with the juvenile court that DHS failed to prove by clear and convincing evidence that mother's parental rights should be terminated by reason of her unfitness.

We first consider the allegation that mother failed to maintain or obtain a suitable living situation and failed to present a viable plan for the return of the children to her care and custody. The record shows that mother and her fifth child had been living with Jill and her husband since approximately April 2002 and that the Wilsons had agreed that she could continue living there with A and E as well, for as long as was necessary; the record shows that, with mother's help, the Wilsons had remodeled their garage to provide living space for mother and the children and that the house as a whole was "child-proof."[3] DHS caseworker Steronko testified that Jill's home appeared "adequate." The record also shows that, although mother had unsuccessfully attempted to obtain Section 8 subsidized housing in September 2002, she remained eligible for such housing and had taken further steps to obtain it.

As to mother's ability to provide financially for the children, the record indicates that, if mother gains custody of the children, she will be eligible for cash assistance and food stamps.[4] Mother testified that her employment history

---

[3] On two occasions in 2002, mother applied to a residential facility in Multnomah County that accommodated parents and children. Both attempts to obtain that housing failed: once due to mother's lack of a social security card for her fifth child and once because, by the time funding was approved for her participation, there were no openings. By the end of January 2003, DHS funding for that program had been terminated due to budget cuts.

[4] At the time of the hearing, apparently in the context of her custody of her fifth child, mother was receiving cash assistance through Adult and Family Services Division of DHS, part of which she was paying to Jill as, in effect, rent.

included having worked as a caregiver, in a managerial position at Taco Bell, as a waitress, and as a convenience store clerk; she recently had completed an eight-week office skills program. She also testified that she had been medically released for vocational training just before the hearing, that she wanted to resume working, and that she was planning to take an assessment class at a learning center. Self-sufficiency service provider Waterhouse testified that she expected mother to be able to begin a job program as soon as the termination proceeding was concluded.

Next, as relevant to mother's parenting and house-keeping skills, the record supports DHS's argument that mother was chronically late for her supervised visits with the children and for other service-related appointments and that she occasionally missed such appointments entirely, sometimes without calling to notify other participants.[5] Nevertheless, there also is significant favorable evidence in the record relating to mother's parenting and housekeeping skills, including her "creativity" in providing toys, crafts, and other activities, as well as appropriate lunches, for the children during visits; her responsive and affectionate behavior toward the children; the cleanliness of her quarters in Jill's house; and her "good parenting" of and attentiveness toward her fifth child, including her close monitoring of his medical condition.[6] After observing a parent-child interaction in the fall of 2001, the psychiatrist, Glass, noted in a written report that mother was attentive to and maintained reasonable and appropriate discipline in regard to each of the three children present on that occasion (A, E, and mother's second child). Glass concluded that mother was "involved," "affectionate," "thoughtful," and "effective"; that she demonstrated "good parenting skills and appropriate involvement with her children"; and that she had done "very well" in the interaction.[7]

---

[5] Mother acknowledged her record of frequent lateness. The record also shows that some of the missed visits were due to the unavailability of other participants.

[6] Mother's fifth child has been diagnosed as suffering from neurofibromatosis, a serious hereditary disorder.

[7] By comparison, after interviewing mother on one occasion, the psychologist, Colistro, opined that mother's "capacity to [be] adequately available to her children relative to meeting their emotional and physical needs is essentially nonexistent" and that she was "not amenable to psychotherapeutic or psychoeducational programming to any significant degree"; he concluded that her prognosis was

The record also contains written reports by therapeutic visitation services provider Weber indicating that, particularly after the birth of her fifth child in February 2002, mother made significant improvements in her ability to parent A and E as well as her second and fifth children. In August 2002—around the same time that DHS petitioned for termination of mother's parental rights—DHS caseworker Steronko noted in a report that mother "pays attention to [her fifth child's] developmental needs," that she "knows where they're at emotionally," and that she "has done well at dealing with the stress of being a single parent." In a report following a family decision meeting on September 16, 2002, Dunn noted that mother "continues to do a great job during visits managing the children and providing great activities." In a report prepared in January 2003, parent mentor Gregg stated that, although mother typically over-structured her visits with the children—particularly when the visits involved her second and fifth children as well as A and E—she was able to identify the children's educational and developmental needs and was following through regarding her fifth child's medical needs. Mother testified at the hearing that she knew "how to access services" and that she believed she could parent the children if given the opportunity.

Moreover, the record—including testimony of community health nurse Kelley and mother's own testimony—indicates that mother's chronic lateness, occasional missed appointments, and related deficits were attributable in substantial part to physical problems mother experienced during her fifth pregnancy, to the medical needs of her fifth child, and to mother's severe anemia, which was not diagnosed and treated until after permanency planning began in August 2002 and the successful treatment of which apparently greatly improved mother's functioning.[8] A September 2002

---

"poor." We find Colistro's opinion of mother's capabilities less persuasive than that of Glass.

[8] Although the record does not indicate the time of onset of mother's anemia, Stacie Torres, mother's caseworker from the time of E's birth in December 2000 until June 2001, testified that, during the time she was working with mother, mother was "tired a lot" and "[a]lways" appeared very pale; Torres did not recommend that mother see a doctor. Mother's eventual treatment for her anemia included four to five months of intravenous iron treatments and, in January 2003, a hysterectomy.

written report of a family decision meeting states that mother had been provided with an appointment book and "is now able to track all of her appointments" including visitation, community health nurse home visits, doctor appointments for her fifth child, individual counseling appointments, and vocational rehabilitation and self-sufficiency services. Mother testified at the hearing that, after her anemia was treated, she felt "100 times better" and that her "physical energy level" since her hysterectomy in January 2003 was "phenomenal."

As noted, DHS also alleged that mother suffered from a mental and emotional condition that rendered her incapable of caring for the children. Consistently with that allegation, a number of witnesses testified regarding mother's emotional instability, including her occasional outbursts of anger or frustration and the occasional appearance of being "exhausted and overwhelmed." Glass and Colistro diagnosed mother as suffering from a personality disorder, as did Hingley and Mulkey, the CCMH counselors.

Nevertheless, Glass, Hingley, and Mulkey also believed that behavioral therapy might be helpful in addressing mother's mental condition.[9] Although DHS caseworker Goldbeck testified that, from June 2001 to August 2002, mother was inconsistent in attending her required individual therapy, DHS social worker Dunn testified that, as of November 2002, mother was attending biweekly mental health appointments. Also, notwithstanding mother's personality disorder diagnosis, Glass generally believed that mother was intelligent,[10] that she had good social skills, and that she functioned well under pressure. Glass testified that mother had a "good prognosis," that she has a "number of strengths and skills," and that her problems did not preclude her from parenting; Mulkey agreed with the latter point.

_____

[9] Mother testified that she was willing to participate in a behavioral therapy program and that such a program would be "very beneficial"; she previously had attended two classes and thought that the skills taught in that program "made sense" and would improve her parenting skills.

[10] Other witnesses also testified that mother was intelligent; for example, Kelley, the CCMH public health nurse, described mother as "bright," "very articulate," and "very observant." Mother's own testimony supports those characterizations.

Glass also testified that he last saw mother in February 2003 and that his observations of her at that time gave him no reason to change his conclusions. As pertinent to mother's emotional and mental condition, mother testified that recent mental health treatment had improved her ability to sleep, her "tolerance level" with her children, and her ability to avoid being emotionally "reactive."

Also as pertinent to mother's emotional and mental condition, the record suggests that, like mother's chronic lateness and her failure to follow through with various service-related expectations, mother's emotional problems may have been at least partly attributable to her severe anemia and to external stressors. Telasha, her obstetrician, testified that severe chronic anemia could result in a "chronic annoyance kind of moodiness" and could affect a person's "thinking process," as well as causing physical fatigue, exhaustion, and low energy levels. Glass believed that mother's emotional problems were partly a result of her financial, transportation, housing, and other "psychosocial" issues and "barriers" rather than mental illness. Other witnesses recognized the relationship between mother's emotional condition and the stresses inherent in coping with DHS's numerous expectations, as well as the demands of the children themselves, including A, E, mother's second child, and, eventually, her fifth child who, as noted, has special medical needs. Hingley testified that some of mother's expressions of anger were "appropriate" under the circumstances; mother's guardian *ad litem*, Bell, testified to the same effect. Dunn testified that mother occasionally became angry or frustrated at family decision meetings but that her conduct was not unreasonable and that, if necessary, she was able to leave the room, compose herself, and return.[11]

---

[11] By contrast, Baker, the psychotherapist who met with mother in 2001, expressed continuing concern about mother's emotional issues. However, Baker had never seen mother interact with the children and did not know that mother was pregnant with her fifth child at the time that she saw mother. Baker agreed that it was significant that mother had been suffering from anemia and that she currently had housing and was successfully parenting her fifth child; she ultimately testified that, although mother needed services to assist her, she was not incapable of parenting.

As to the effect of mother's conduct and condition on the children, as noted, DHS caseworker Goldbeck testified that, during the time that she was mother's caseworker, mother was inconsistent in attending individual therapy, that she did not follow through regarding job training, and that her punctuality remained a problem. Goldbeck also testified, however, that she had no information indicating that mother had ever abused or neglected any of her children. Steronko agreed that, during his tenure as mother's caseworker, there was no evidence that mother had "done anything harmful or dangerous with" A or E. Although there is evidence in the record, including mother's own testimony, that mother was inattentive to E after her birth and was not optimally bonded with her, mother also testified that E was in a breech position before birth, that the child was manually turned by hospital staff, and that, as a result of those procedures, mother was in "extreme pain" for two days before E's birth and had an "emotional breakdown" afterward. In addition, consistently with Goldbeck's testimony, mother's failure to bond with E may be attributable in part to the fact that the child was removed from mother's custody at birth and that mother was never E's primary caretaker. In any event, Weber, who provided therapeutic visitation services to mother, testified that mother and the children were, in fact, bonded.

Based on the foregoing evidence, we cannot conclude that mother's parental rights should be terminated by reason of unfitness. As we have explained, the record shows that, at the time of the hearing, mother had obtained adequate housing for herself and the children and that, to the extent DHS apparently expected mother to obtain "independent" housing, she was eligible for and intended to seek subsidized housing and other forms of assistance; in addition, mother planned to seek employment. There also is ample evidence in the record that mother's housekeeping and her parenting of A and E, as demonstrated in the context of her visitation with the children and as reported by a number of witnesses, had improved over time and currently were adequate. *See State ex rel Juv. Dept. v. Johnson*, 165 Or App 147, 157, 997 P2d 231 (2000) (proof of "imperfect parenting techniques" is not

enough to support finding of unfitness). In addition, as discussed above, at the time of the hearing, mother was participating more regularly in mental health treatment and her mental health status had improved, in part due to a significant improvement in her physical health. The described evidence also demonstrates that, by the time of the hearing, mother had significantly adjusted her circumstances. *See, e.g., State ex rel Juv. Dept. v. Proctor*, 167 Or App 18, 29-30, 2 P3d 405, *adhered to on recons*, 169 Or App 606, 10 P3d 332 (2000) (where the parent had shown progress in improving her parenting skills, the state failed to prove that it was highly probable that she would be unable to parent the child within a reasonable time); *Johnson*, 165 Or App at 156-57 (state must show that parent is *"presently* unfit" and that integration of child into parent's home is improbable within a reasonable time; past deficits, if no longer present, do not support termination (emphasis in original)).

Equally importantly, even assuming that, at the time of the hearings, mother had not achieved optimal housing or other practical arrangements, that she had not completed such required services as individual psychotherapy and job training, and that she continued to suffer from some degree of emotional instability or other manifestation of her personality disorder, the record is lacking in evidence showing that those deficits have had any seriously detrimental effect on A and E. *See Stillman*, 333 Or at 149-53; *see also, e.g., State ex rel SOSCF v. Mellor*, 181 Or App 468, 477, 47 P3d 19 (2002), *rev den*, 335 Or 217 (2003) (under ORS 419B.504(1), diagnosis of mental or emotional disorder or illness is not enough; there must also be evidence that disorder or illness renders the parent "incapable of providing proper care for the child for extended periods of time"); *State ex rel SOSCF v. Burke*, 164 Or App 178, 187, 990 P2d 922 (1999), *rev den*, 330 Or 138 (2000) (evidence of underlying problem is not enough; state must show that the parent's conduct or condition is seriously detrimental to the child). To the contrary, the record shows that mother has never abused or neglected the children, that she behaves appropriately toward them, that the children are affectionate toward and happy to see mother, and that they are developmentally "on target."

In short, on *de novo* review, we conclude that DHS failed to prove by clear and convincing evidence that mother was unfit as provided in ORS 419B.504. It follows that the trial court did not err in denying the petitions for termination of mother's parental rights to A and E.

Affirmed.