Argued and submitted November 2, 2006, reversed April 11, 2007

In the Matter of
C. R.-J. P., a Minor Child.

STATE ex rel
DEPARTMENT OF HUMAN SERVICES,
*Respondent,*

*v.*

A. M. P.,
aka A. M. J.,
and B. P., II,
*Appellants.*

030352J; A131450 (Control)

In the Matter of
B. N. P., a Minor Child.

STATE ex rel
DEPARTMENT OF HUMAN SERVICES,
*Respondent,*

*v.*

A. M. P.,
aka A. M. J.,
and B. P., II,
*Appellants.*

030353J; A131451

In the Matter of
K. F. M. P., a Minor Child.

STATE ex rel
DEPARTMENT OF HUMAN SERVICES
*Respondent,*

*v.*

A. M. P.,
aka A. M. J.,
and B. P., II,
*Appellants.*

040544J; A131452

157 P3d 283

Gary B. Bertoni and Bertoni & Todd filed the brief for appellant A. M. P.

James A. Palmer filed the brief for appellant B. P., II.

Brendan C. Dunn, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Schuman and Ortega, Judges.

ORTEGA, J.

**ORTEGA, J.**

Mother and father appeal from a juvenile court judgment terminating their parental rights to their three children, B, C, and K. Although the termination decision as to both parents was based on unfitness alone, each challenges termination based on unfitness, ORS 419B.504, and neglect, ORS 419B.506. We address only unfitness, the sole basis for the trial court's decision, and, on *de novo* review, ORS 419A.200(6), reverse the termination as to both parents.

Mother and father have been married since 2001. In May 2003, both were using methamphetamine. About a month later, a Department of Human Services (DHS) worker visited their home in response to a referral reporting that the house was below community standards and that the children were being neglected. The worker found the home to be so dirty that she did not consider it safe for B and C, who at that time were three years old and six months old. (K was not yet born.) The floor was covered with piles of clothes, debris, and garbage, and the children's bedroom was so full of debris that the worker was unable to see the beds. Another room was filled chest high with dirty clothes and smelled extremely bad. A razor blade in the bathroom was within reach of a child, and both children were extremely dirty and smelled like urine. The bottom of one child's feet were nearly black with dirt and grime. Because mother was very fidgety and could not concentrate and her face and arms were extremely broken out, the worker suspected that she was using methamphetamine. The children were removed from the home, and both parents signed service agreements requiring them to participate in drug and alcohol evaluations, psychological evaluations, parenting classes, mental health treatment, and visitations with the children.

Around the same time period, the police were investigating mother and father for a number of property crimes. Father had been entering victims' homes and vehicles to steal purses, wallets, and other property, and would then give blank checks, ATM cards, and credit cards to mother, who would use them for purchases. Mother also used at least one victim's identity to obtain credit and attempted to use her

daughter B's identity to obtain credit. Father eventually admitted to seven different unauthorized entries, and mother admitted to 43 separate purchases with stolen checks and cards.[1] Mother was placed on probation, father was sentenced to 50 months in prison, and both were held jointly and severally liable for restitution of over $10,000.

In the six months after father signed the service agreement, but before going to prison, father made some progress in complying with that agreement. He participated in a drug and alcohol assessment at On-Track, a drug and alcohol treatment center, where he reported that his recent use of methamphetamine was a "binge" after three years of sobriety. He was assessed as needing "Level 1" treatment (with "Level 0.5" being the least intensive treatment level) but was terminated from the program after failing to attend meetings. Father also had two positive urinalysis tests for opiates and marijuana while at On-Track. Nevertheless, he testified at trial that, after he left On-Track but before going to prison, he completed a Level 3 drug and alcohol treatment program at the Addiction Recovery Center (ARC).[2] Additionally, the record indicates that, before incarceration, father began parenting classes, visited the children consistently, and scheduled a psychological evaluation. For the most part, however, father failed to complete the requirements of his service agreement and, in February 2004, father went to prison and remained there through the termination trial nearly two years later.

Mother also was assessed at On-Track, where she denied any type of drug use and admitted to only modest alcohol use. Her evaluator commented that mother was "irritable" and "argumentative," and that mother's "use of deception indicates [a] lack of readiness to change." Because she had denied drug use, her only diagnosis was alcohol abuse, and she consequently did not receive any treatment addressing methamphetamine use.

---

[1] Later in 2003, mother committed additional thefts at her place of employment by overcharging customers' credit cards.

[2] The other verification that father participated in the ARC program is that mother reported his participation during her two psychological evaluations. Additionally, father's caseworker noted his completion of the ARC program during a family decision meeting in December 2003.

In a comprehensive psychological evaluation in October 2003, mother tested in the average range of intelligence, with an IQ score of 95. The evaluator, Dr. Knapp, diagnosed mother with an "adjustment disorder with mixed disturbance of emotions and conduct," and commented that she "[did] not seem to be suffering from serious psychological difficulties." He noted, however, that mother was so "defensive in attempting to present that she has no problems, weaknesses or deficits [that] most of the testing she completed * * * was invalid." During the evaluation, mother admitted to criminal behavior but denied drug use. Because mother presented so defensively in her parenting evaluation, Knapp was "unable to determine that [mother] ha[d] any striking parenting weaknesses." Nonetheless, Knapp concluded that mother "ha[d] very good potential to be an appropriate parental resource for her children."[3]

Initially, mother did not attend her assigned groups at On-Track, but in early 2004 she began to engage more in the programs offered to her. She had clean UAs, participated in monthly one-on-one counseling and a weekly anger management class at On-Track, and completed a parenting class. She was pregnant with K, and B and C were returned to her in April 2004. K was born about a month later.

However, mother's drug use and criminal activity soon resumed. Mother was cited a number of times for shoplifting, including one incident when she had her children with her. She also was charged with stealing lottery tickets, and when the officers went to her home to arrest her, they found a stolen checkbook and stolen identification.

Five months after B and C were returned to mother, a DHS worker visited her home and found it in an unsafe and unsanitary condition, much like when the children were removed the first time. Additionally, methamphetamine pipes were found, and the lesions on mother's face and her agitated state indicated methamphetamine use, which was confirmed by a subsequent UA. The children were taken into

---

[3] At trial, Knapp testified that, had he known that mother regularly used methamphetamine or that mother had committed additional crimes after the evaluation (which she had), he would have concluded that she probably had an underlying personality disorder with antisocial features.

protective custody and, a few weeks later, mother was incarcerated. She served 10 months and was released at the end of August 2005, just over three months before the termination trial.

Most of the evidence regarding the year before trial relates to mother. What little evidence we have regarding father comes from his testimony. While in prison, he completed a 27-hour cognitive restructuring class and a 90-hour parenting class, and had nearly obtained his GED as of the time of trial. He continued to be in contact with the children through letters, phone calls, and several visits over a one-week-long period. He admitted that K, who was about a year-and-a-half old at the time of trial, does not know him. Father testified that his release date was set for April 2008, but that he expected to be released as early as November 2007. He asserted that he plans to reunite with mother on his release, and mother likewise testified that she and father were trying to "work things out."

Mother likewise participated in programs while in prison, including an anxiety class, a coping skills class, and a class called Miracles of New Beginnings, as well as numerous religious services. She also participated in a psychological evaluation with Dr. Gordon. The results were largely consistent with Knapp's evaluation, except that Gordon added diagnoses of amphetamine abuse and a personality disorder not otherwise specified, with avoidant and antisocial features. Gordon noted that mother "downplayed the issues that brought her and her family to the attention of DHS" and "took no responsibility" for the unsafe and unsanitary condition of her home. He reported that mother did not evidence any concern or understanding regarding the effects of her behavior on her children's psychological and physical well-being. He opined that her methamphetamine use is a "major concern" that should not be "taken lightly" and that mother did not seem committed to making changes and only appeared willing to superficially comply with constraints imposed on her by the judicial system. At trial, Gordon testified that mother's prognosis was poor.

On her release from prison three months before trial, mother resumed employment with a former employer at a

call center. Her manager testified that she had been working 20 to 40 hours per week and was a good employee; indeed, he indicated that she was always a "top five" employee. Mother was living at her parents' house, but had nearly completed a "second chance" housing program for people with criminal histories. Mother also had started another parenting class, and the instructor felt that she was demonstrating a higher level of commitment than she had previously.

Mother became active in church after her release. Her pastor testified that she had met with him for counseling roughly nine times and that he considers her very sincere in her motivation and "forthcoming" in her discussions with him about her past drug use. Mother also attended Sunday services and a "victorious living" group.

Mother also engaged with drug treatment for the first time. She was reassessed at On-Track a month after her release from prison and was diagnosed with methamphetamine dependence in early full remission.[4] Mother's counselor testified that she was attending a weekly 12-step program, was currently on her seventh step, and appeared "motivated" and was "doing well" in the program. Further, mother's "numerous" UAs all came back negative. Mother reported that she also had been attending 12-step meetings on her own, although she had not given her counselor any slips to verify attendance.

A member of the children's foster family testified that, since mother's release, she had seen mother at a bar once and had seen her buying liquor three times. Even one such incident would constitute a violation of the terms of mother's post-prison supervision that could result in mother being returned to prison for 90 days. (Mother testified that she had not been in a bar since her release, and mother's mother testified that she and mother were shopping on the evening of the alleged bar incident.) Mother's mother suspected at one point that mother was using drugs again and asked mother's probation officer to give her a UA. However, at trial mother's mother testified that she was just being

---

[4] Early full remission indicates six months to a year of sobriety. That diagnosis was considered appropriate in mother's case even though she was incarcerated for all but one of those months of sobriety.

"paranoid"; she indicated her belief that mother had not used drugs since her release.

Finally, regarding the children, the record indicates only that they had been in substitute care for 26 of the 31 months before trial; that most of that time they had been placed with mother's parents;[5] that there were additional relatives involved and bonded with the children; and that, generally, the children were "doing well."

The juvenile court found that the state had established, by clear and convincing evidence, that mother and father are unfit by reason of conduct or conditions seriously detrimental to the children and that integration into the home is improbable within a reasonable time. The court concluded that mother's mental illness and criminal activity make her unable to maintain a stable and suitable living situation or properly care for the children. It found that her testimony "completely lacked credibility," that she "is in a general state of denial about her limitations," and that "she exaggerates and shades the truth." With regard to father, the court found that his rights should be terminated because he "has not been a resource in [the] children's lives and, because of choices he has made to participate in criminal conduct, will not be a resource to them in the foreseeable future."

■       We share the trial court's concerns about both parents and give considerable weight to its credibility findings. *See State ex rel SOSCF v. Farish*, 182 Or App 322, 334, 49 P3d 811, *rev den*, 334 Or 693 (2002). Nevertheless, we conclude that the state failed to present clear and convincing evidence that either parent is presently unfit. Accordingly, we reverse.

ORS 419B.504 provides, as relevant here:

"The rights of the parent or parents may be terminated * * * if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child * * * and integration of the child * * * into the home of the parent or parents is improbable within a

---

[5] That placement ended three months before trial at the request of mother's parents, who were experiencing health problems. At the time of trial, the children were placed with other relatives.

reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"(1) Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child * * * for extended periods of time.

"* * * * *

"(3) Addictive or habitual use of * * * controlled substances to the extent that parental ability has been substantially impaired.

"(4) Physical neglect of the child * * *.

"(5) Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make it possible for the child * * * to safely return home within a reasonable time or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

"(6) Criminal conduct that impairs the parent's ability to provide adequate care for the child * * *."

The Supreme Court has observed that both parts of the two-part test contained in ORS 419B.504 must be met before the court orders termination:

"First, the court must address a parent's fitness: The court must find that the parent is 'unfit by reason of conduct or condition seriously detrimental to the child.' That, in turn, requires a two-part inquiry: The court must find that: (1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is 'seriously detrimental' to the child. Second—and only if the parent has met the foregoing criteria—the court also must find that the 'integration of the child into the home of the parent * * * is improbable within a reasonable time due to conduct or conditions not likely to change.' "

*State ex rel SOSCF v. Stillman*, 333 Or 135, 145, 36 P3d 490 (2001); *see also State ex rel Dept. of Human Services v. Smith*, 338 Or 58, 80-81, 106 P3d 627 (2005). Additionally, the court must find that termination of parental rights is in the best interests of the child. ORS 419B.500.

■■ The state must prove unfitness by clear and convincing evidence. Evidence is clear and convincing if it makes the existence of a fact "highly probable" or if it is of "extraordinary persuasiveness." *State ex rel Dept. of Human Services v. Hinds*, 191 Or App 78, 84, 81 P3d 99 (2003). Further, the state must prove more than unfitness at some point in the past, but rather must prove that the conduct or condition is seriously detrimental *at the time of the termination hearing*. *State ex rel Dept. of Human Services v. Huston*, 203 Or App 640, 654, 126 P3d 710 (2006).

■ Regarding mother, the state identifies her personality disorder and her methamphetamine dependence as the conditions that are seriously detrimental to the children. The state contends that, as a result of those conditions, mother has failed to properly care for the children and has allowed them to live in squalor. Additionally, her conditions have led her to repeatedly commit theft-related crimes that have resulted in incarceration and separation from her children.

The state further contends that mother's conditions will not change within a reasonable time. It notes that mother has failed to obtain treatment for her personality disorder and adds that her continued minimization of her problems and her denial about her limitations illustrates that it is "highly probable" that she will never address that mental illness. The state further contends that mother's past drug relapses and her recent conduct in entering a bar and a liquor store demonstrate that, even if she completes drug treatment, there is little likelihood that she will remain sober.

Mother responds that this case is similar to others in which we have reversed a finding of unfitness because of progress made by the parent at the time of trial. For example, mother cites *State ex rel Dept. of Human Services v. Lee*, 194 Or App 633, 645-46, 96 P3d 823 (2004), where we held that the juvenile court erred in terminating the mother's parental rights because, at the time of the hearing, the mother had obtained adequate housing, had improved her parenting and housekeeping skills, had demonstrated improvement in her mental health, and had participated in mental health treatment. We further held in *Lee* that, more importantly, termination could not be upheld even without those accomplishments because the record lacked evidence that mother's

deficits had a seriously detrimental effect on her children. *Id.* at 646.

Mother also points to *State ex rel SOSCF v. Armijo*, 151 Or App 666, 684, 950 P2d 357 (1997), where the mother's "substantial efforts" as of the time of the termination hearing were the basis for reversing the judgment of termination. *Armijo*, like this case, involved a mother who suffered from mental illness and had a history of drug abuse. 151 Or App at 668, 670-71. By the time of trial, however, she had completed a drug treatment program, was active in a faith-based treatment program, and had achieved 10 months of sobriety. *Id.* at 674, 678, 682. Although we recognized some uncertainty regarding whether the mother's changes were transitory or would survive long-term, that uncertainty indicated to us that the state had failed to prove, by clear and convincing evidence, that reunification was improbable within a reasonable time. *Id.* at 682.

We acknowledge that mother has made some progress in the three months before trial. On her release from prison, mother regained employment and voluntarily engaged in a number of services. She was participating in drug treatment, and her "numerous" negative UAs indicate that mother was maintaining sobriety. Further, she was participating in parenting classes, housing classes, and several different church activities. Despite the problems with mother's credibility noted by the juvenile court, her actions and the testimony of her pastor and treatment providers provide some evidence that she is presently attempting to change her life for the better.

However, mother's progress is not as substantial as that made by the parents in *Lee* and *Armijo* and, as in *Armijo*, there is reason to question whether the positive changes are temporary and whether mother is likely to relapse into drug use and criminal activity. In any event, we need not resolve the question whether the children can be reunited with mother within a reasonable time because this record, like the record in *Lee*, lacks evidence that mother's conduct and conditions were *seriously detrimental to the children* at the time of trial.

■ ORS 419B.504 requires the state to prove that a parent's conduct or condition "has had a seriously detrimental effect on the child." *Stillman*, 333 Or at 146. That inquiry is meant to be "child-specific" and calls for "testimony in psychological and developmental terms regarding the particular child's requirements." *Huston*, 206 Or App at 657. For example, the special needs of the child involved in *State ex rel Dept. of Human Services v. Cain*, 210 Or App 237, 256-57, 263-65, 150 P3d 439 (2006), *rev den*, 342 Or 503 (2007), required that the child live in an extremely stable and predicable environment and that he have access to a comprehensive network of support services, without which his development would be placed at great risk. The record established that the mother's condition in *Cain*—borderline personality disorder and drug use that exacerbated that mental illness—rendered her unable to provide that stability or to recognize and accommodate those needs. *Id.* at 263-65. As a result, this court concluded that her condition was seriously detrimental to the child. *Id.* at 267.

■■ The record here is frustratingly devoid of any evidence regarding the children. Instead, the state apparently advocates that we draw generalized conclusions regarding the harmful effect mother's past behavior would have on any child. Such generalized conclusions are insufficient to support a finding of unfitness. *See Stillman*, 333 Or at 146, 149-50; *State ex rel SOSCF v. Blum*, 175 Or App 447, 456, 28 P3d 1231 (2001), *rev den*, 333 Or 399 (2002). Rather, a more specific showing regarding the particular children at issue is required.[6] All we know here is that the children have been primarily placed with their maternal grandparents, are bonded with their extended family, and in general are "doing well." The state has failed to present any testimony or other evidence describing how mother's personality disorder, her drug use, or her criminal activity and incarceration have

---

[6] The state is not required to show that the particular child involved *actually suffered* some cognizable harm from the parent's conduct or condition. *See State ex rel SOSCF v. Frazier*, 152 Or App 568, 600, 955 P2d 272, *rev den*, 327 Or 305 (1998); *Huston*, 206 Or App at 675 (Diets, J., pro tempore, dissenting). However, the state is required to show that the conduct or condition placed the child at sufficient *risk* of harm. *Blum*, 175 Or App at 456.

affected the children, or regarding mother's present relationship with the children, or regarding any special needs of the children that may affect their potential reintegration into mother's home.

Considering mother's modest (although potentially short-term) successes at the time of the termination hearing along with the lack of evidence regarding the effect of mother's conduct and conditions on the children, the state has failed to prove with "extraordinary persuasiveness" that mother's conditions are seriously detrimental and that integration into mother's home is improbable within a reasonable time.

■ Regarding father, the state identifies his drug use and criminal activity as the seriously detrimental conduct that renders him unfit. The state contends that, as a result, father has failed to provide for their needs, has exposed them to criminal behavior, and has been separated from them for long periods of time due to his incarceration. The state further contends that father's separation from his children will not change within a reasonable time because his release date is set for more than a year after the termination hearing.

Father responds that the termination judgment must be reversed under the Supreme Court's holding in *Stillman*. There, an incarcerated father was scheduled to be released four months after the termination hearing. 333 Or at 142. While in prison, the father had successfully completed a drug treatment program, attended 12-step meetings, and completed a number of other classes and services. *Id*. at 141-42. As noted above, the court explained that, in order for incarceration to warrant termination, the state must prove that the incarceration is seriously detrimental to the children. *Id*. at 147-49.

The record in *Stillman* contained very little psychological evidence pertaining to the children, and there was "virtually nothing" in the record that shed any light on any ill effects the children might have suffered from their parents' prior substance abuse. *Id*. at 140. Rather, the court noted that the evidence suggested that, aside from anxiety about their future, the children were "relatively happy and well-adjusted" and that their relationship with the father was

"loving, strong, and positive." *Id.* at 150, 152. Accordingly, because the state had failed to show, by clear and convincing evidence, that father's incarceration was seriously detrimental to the children, the evidence did not warrant a finding of unfitness. *Id.* at 152-53.

Similar to the problem with the state's case against mother, this record contains even less evidence regarding the children than the record in *Stillman*. There, at least, the record included some direct testimony regarding the children, *id.* at 150; this record mentions them only in passing. We know almost nothing about father's relationship with the children, how much he has been in contact with them, or how his incarceration and past behavior may have affected them. As in *Stillman*, the record lacks sufficient evidence that father's incarceration is seriously detrimental to the children.

Moreover, the state presented almost no evidence regarding father's current condition beyond his incarceration. Virtually everything we know about his present situation—including his participation in drug treatment, his maintenance of sobriety, the classes he has taken in prison, and his contact with the children—comes from his testimony. Far from establishing that father is presently unfit, that evidence suggests that father has been making improvements to his situation. The record accordingly lacks sufficient evidence to support termination of father's parental rights.

Reversed.