In the Matter of
Devon Edward Byrd, a Minor Child.

STATE ex rel DEPARTMENT
OF HUMAN SERVICES,
*Respondent,*

*v.*

HOLLY RHEANAN CAIN
and Gary Byrd,
*Appellants.*

0100727; A131436

150 P3d 439

James A. Palmer argued the cause and filed the brief for appellant Holly R. Cain.

Inge D. Wells filed the brief for appellant Gary Byrd.

Christina M. Hutchins, Assistant Attorney General, filed the brief for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Ortega, Judge, and Breithaupt, Judge pro tempore.

ORTEGA, J.

**ORTEGA, J.**

Mother and father appeal from a juvenile court judgment terminating their parental rights to their child, D. The trial court determined that mother was presently unfit, ORS 419B.504,[1] primarily because of her mental illness, her drug use, and her failure to effect a lasting adjustment to those circumstances. The trial court also terminated father's parental rights based on unfitness, ORS 419B.504, and neglect, ORS 419B.506.[2] We conclude that the record establishes beyond a reasonable doubt that, for a period of nine months before the filing of the petition and for more than two years before the trial, father elected not to participate in visitation and did not have any contact with D. Therefore, on *de novo* review, we affirm the termination of father's parental rights based on neglect. *See State ex rel Dept. of Human Services v. Squiers*, 203 Or App 774, 789, 126 P3d 758 (2006) ("[A] finding of neglect [may] be based on * * * a parent's failure to maintain contact[.]"). We write only to address mother's challenge to the termination of her rights based on unfitness.

We begin by identifying the applicable law. Father is a member of the Upper Skagit Tribe, and the parties agree that child is an Indian child to whom the Indian Child Welfare Act (ICWA) applies. 25 USC § 1903(4) (defining Indian child); OAR 413-070-0120(8) (same). The ICWA's requirements supplement and, where in conflict, displace state law governing the termination of parental rights to Indian children. *State ex rel SOSCF v. Amador*, 176 Or App 237, 243, 30 P3d 1223, *rev den*, 333 Or 73 (2001); *see also State ex rel Juv. Dept. v. Tucker*, 76 Or App 673, 677, 710 P2d 793 (1985), *rev*

---

[1] For the provisions of ORS 419B.504, *see* 210 Or App at 259-60.

[2] ORS 419B.506 provides, in part:

"The rights of the parent or parents may be terminated * * * if the court finds that the parent or parents have failed or neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the child or ward for six months prior to the filing of a petition. In determining such failure or neglect, the court * * * shall consider * * *:

"* * * * *

"(2) Failure to maintain regular visitation or other contact with the child * * *.

"(3) Failure to contact or communicate with the child * * *."

*den*, 300 Or 605 (1986) (noting that the ICWA applies when the court "knows or has reason to know that an Indian child is involved") (citing 25 USC § 1912(a); further citation omitted). Accordingly, termination of mother's parental rights must be supported by evidence beyond a reasonable doubt, the standard applicable under the ICWA. ORS 419B.521(4); 25 USC § 1912(f). *See generally State ex rel Juv. Dept. v. Charles*, 106 Or App 637, 639, 810 P2d 393, *rev den*, 312 Or 150 (1991) (applying the ICWA to proceedings involving an Indian child and a non-Indian parent). We review the juvenile court's judgment *de novo*, ORS 419A.200(6)(b), giving considerable weight to its findings regarding credibility, and affirm.

We turn to the factual record, beginning with an overview before delving into mother's complicated history. The record contains a number of psychological evaluations of mother and, although the diagnoses vary slightly, they all identify her as suffering from a personality disorder characterized by extreme emotional instability and impulsivity and by frequent and inappropriate expressions of anger and conflicts with others, particularly with authority figures. Additionally, mother's history includes periodic methamphetamine use, addiction to marijuana, and domestic violence.

Mother's involvement with the Department of Human Services (DHS) spans an eight-year period beginning with the birth of her first child, J, in 1997.[3] We divide the relevant history into three time periods: (1) the four-year period beginning in 1997, when DHS first began working with mother, until early 2002, shortly after D's birth and his removal from mother's home; (2) the following two years, ending in 2004, which were characterized by DHS's insistence on, and mother's resistance to, mental health and drug treatment; and (3) the final period leading up to the termination trial in late 2005, which includes mother's mixed successes in mental health and drug treatment. Within each

---

[3] Mother has voluntarily relinquished her parental rights to J; nonetheless, as will become apparent, evidence of her relationship with J is relevant to this case. *See generally State ex rel SOSCF v. Farish*, 182 Or App 322, 334-35, 49 P3d 811, *rev den*, 334 Or 693 (2002) (stating that evidence of abuse of a child's sibling directly bears on fitness).

time period, we focus on three topics: (a) mother's involvement and interaction with DHS; (b) mother's mental health issues and therapy; and (c) mother's drug use and attempts at recovery.

We begin with the first time period, spanning from 1997 to D's birth in early 2002. DHS first became involved with mother and her first child, J, because he was hospitalized for failure to thrive two weeks after he was born. In the ensuing two years, DHS received approximately 11 referrals, or reports of concern, about mother's care of J, although two were deemed unfounded. The referrals consistently involved reports of physical abuse and neglect of J. The first referral, when J was six weeks old, consisted of a report that J was not being fed enough. Mother explained that she had not fed J any formula for a period of more than 24 hours because her father (whom she had not asked) would not take her to get any formula and that, in any event, the baby was fine because he was sleeping. When J was 15 months old, a referral occurred after mother slapped J, leaving a hand print on his face. At the time, mother admitted to the slap and explained that she had "just lost it"; at trial, mother denied the incident but did admit to another slapping incident that occurred when J was 3 or 4 years old. Another referral consisted of a report that mother was not bathing or feeding J and that she had spanked him for waking up too early. The referrals reflected a continuing pattern of, as one DHS worker described it, "over and over and over again [mother] losing her temper and slapping [J]."

A twelfth referral in late 2000 consisted of a report that J was found wandering the neighborhood early in the morning, alone, dressed only in a diaper. J was removed from mother's care, a petition was filed, and mother was convicted of criminal neglect for the incident. Mother's interactions with DHS following that incident were particularly volatile; she threatened a caseworker who was trying to schedule a family decision meeting with the comment, "You have no fucking idea how bad[ly] I want to beat the shit out of you right now." Mother asserted, "I don't need [a] fucking meeting. I need my fucking kid."

Indeed, mother's interactions with DHS workers, family members, and others were consistently volatile, aggressive, and even violent. DHS employees reported on various occasions that mother was "furious," "very hostile," "combative," and "aggressive" during their interactions with her. One caseworker explained that mother "[did not want] anybody to tell her how to do anything, how to raise her son." Another DHS worker said that mother's attitude would frequently shift from cooperative to belligerent. During this first time period, mother's father and an ex-boyfriend filed restraining orders against her. Mother's father stated in support of his restraining order that mother had threatened him and that she "follow[ed] through [with] threats." The ex-boyfriend stated in support of his order that mother is an "unstable person and [there is] no telling what she would do." Mother also was arrested for assault when she threw a soda can at her mother, causing a skull fracture. Mother boasted about the incident to a caseworker, who testified that mother laughed about the fact that she "had just gotten into a fist fight with her mother [and] had been charged with cracking * * * her skull open."[4] In another incident involving police, mother tried to punch J's babysitter and chased her out the door after the babysitter suggested that mother clean up J and change his clothes.

Eventually, mother signed a service agreement with DHS, and complied with the agreement by engaging in supervised visits with J and completing a parenting class. She also participated in a comprehensive psychological evaluation, performed by Dr. James Ewell in December 2000. Ewell diagnosed mother with attention deficit/hyperactivity disorder (ADHD); post-traumatic stress disorder (PTSD); and borderline, antisocial, and narcissistic personality disorders.

According to Ewell, mother's most salient features were affective instability, a history of inappropriate and intense anger, stress-related paranoid ideation, unstable relationships, and impulsivity. Because she suffered from

---

[4] At trial, mother explained that she threw the soda can at her mother, who was very drunk, "before she had a chance to hit me."

multiple forms of psychopathology, Ewell considered her situation to be "quite complex and disabling" and indicated that she would need intensive, long-term intervention, including psychotherapy, parenting classes, anger management, and support group work. Her prognosis for change was poor, not only because mother's personality disorders would be highly resistant to intervention, but because mother considered herself to be a "great mother" with no need for services. Ewell referred mother to Douglas County Mental Health (DCMH) for mental health treatment.

Dr. Randy Olander, a psychologist for DCMH, evaluated and began individual therapy with mother several months after Ewell's evaluation. Similarly to Ewell, Olander diagnosed mother with a personality disorder not otherwise specified, with borderline and narcissistic traits. Additionally, he diagnosed her with an adjustment disorder with depressed mood and polysubstance abuse in early remission. Olander testified that mother's life seemed to be in ongoing "chaos" and that she appeared to consider treatment to be "an inconvenience to her." She was "verbally combative" at times and once called him a liar. Eventually he referred mother to another therapist at DCMH because he and mother were "not a good personality fit."

Around the same time that J was removed from mother's care in late 2000, mother began an intimate relationship with father and eventually became pregnant with D. The relationship between mother and father involved both domestic violence and drug use. For example, a few months before D was born, mother filed for a restraining order against father, claiming that he had "beat on [her] causing bruises, maced [her] in the face, [and] hit [her] in [the] stomach."[5] Mother submitted a 43-page document to the court detailing physical abuse and drug use, but withdrew the application for a restraining order two days later, telling the court that she had lied.

---

[5] When asked about the incident at trial, mother stated that she "never told anybody that he maced me in the face."

Mother admits significant drug use. She began smoking marijuana at age 16 and began using methamphetamine at the start of her relationship with father. Mother admitted smoking marijuana during her pregnancy with D and using methamphetamine at one point "before [she] found out [she] was pregnant." When D was born in November 2001, his toxicology screen was negative—meaning that there were no drugs in D's system—but mother tested positive for tetrahydrocannabinol (THC) and pseudoephedrine, indicating recent use of marijuana and methamphetamine. As a result, DHS filed a petition regarding D within days of his birth. Rather than remove D from the home, however, DHS attempted to engage mother in services. Because DHS was having difficulty finding a stable foster care placement for J (who was in his seventh or eighth placement), DHS also returned J to mother at that time.

This brings us to the second time period, from early 2002 to early 2004. As of January 2002, mother and father were living together, J had been returned to the home, and D was two months old. This arrangement lasted only a few months and dramatically changed one day when mother came to the DHS office in a panicked and "visibly shaken" state. She told her DHS caseworker that she believed that the police were about to raid her and father's home because father had been dealing marijuana and methamphetamine. She worried that the children would go to foster care as a result of the raid. Additionally, mother admitted that she had been using marijuana and methamphetamine on a regular basis. Mother's caseworker arranged for J to be placed back in foster care and referred mother, along with D, to Crossroads, an inpatient drug treatment program.

Mother was assessed as needing "Level 3" care (with "Level 4" being the most intensive care level), and, at intake, a substance abuse counselor recorded that mother reported "extensive [use of] drugs and alcohol" recently and throughout her pregnancy with D. Mother's primary counselor at Crosswords stated that mother was emotionally distraught and unstable, frequently becoming upset, crying, and shouting, and was unwilling to cooperate with putting together a treatment plan. Even though mother understood that D, too,

would be placed in foster care if she left Crossroads prematurely, she left Crossroads after five days.

At trial, mother explained that she had left Crossroads because she "sat in a room * * * in a rocking chair with [D] with nothing but a TV in front of me all day long for five days." She continued, "I had not had any groups[;] I had no classes[;] I had no books or paperwork given to me and I think five days is more than a sufficient amount of time to start treating somebody[.]" However, mother's primary counselor contradicted that testimony, explaining that activities had in fact been scheduled for mother. Mother's record at Crossroads contains a note that mother was "emotionally agitated—shouting, crying, demanding and refusing to comply."

Mother's caseworker and her attorney tried for two hours to dissuade mother from leaving the program, reminding her that D would be placed in foster care. According to the caseworker, mother "did [not] care," insisting that she "couldn't handle it * * * anymore" at Crossroads. So, mother placed D in a car seat, kissed him good-bye, and left, and D was placed with his current foster care providers, who are father's niece and her husband.

Shortly after mother left Crossroads, she began participating in a treatment group for people with "dual diagnoses" (that is, people suffering from two or more diagnoses, usually including addiction and mental illness) at ADAPT, an outpatient treatment facility. Sasha Maddox, a counselor specializing in "dual diagnosis" treatment, worked with mother for several months. She testified that mother denied using methamphetamine (despite having recently admitted regular use to DHS) and generally had "a lot of difficulty accepting responsibility for the circumstances she was in * * * due to drug and alcohol use." She also had difficulty managing her emotions in group sessions and was frequently very argumentative. Maddox wrote in her notes that mother was continually "defocusing, blaming, rationalizing and minimizing" and that mother's "issues around victimization and learned helplessness * * * seem impenetrable."

Maddox ended her counseling relationship with mother after an explosive incident in which mother came to

Maddox's office yelling and demanding a urinalysis test (UA). Mother was so aggressive that two other counselors responded with concern. After about 15 minutes, when mother had apparently calmed down, Maddox agreed to administer a UA. However, in the bathroom, mother began yelling obscenities within an inch of Maddox's face. Maddox testified that she had never, before or since, dealt with a client so aggressive and abusive.

By all indications, mother did not meaningfully engage in treatment at ADAPT. During her time there, five or six out of 35 UAs tested positive for THC. Maddox's case file ended with the observation that mother "is not in recovery. She is not working on her * * * violent aggressive behavior, making amends[, or] working a program of honesty and humility, but [is] stuck in a rapid cycle of blaming, excuse making, minimizing, * * * and not taking responsibility for her behavior." At trial, mother explained that her failure to complete the ADAPT program was because she "didn't click" with her counselor and that she had issues with being told she was "a junkie": "[I]t didn't really make sense * * * for her to tell me that smoking pot was like a crime[.]"

Throughout this second time period, mother was also receiving mental health treatment at DCMH, where she had been referred in 2000. After receiving treatment from Olander, mother had been transferred to a new therapist, Sandy Willette, who specializes in treating patients with borderline personality disorder (BPD). Willette reevaluated mother and changed her diagnosis to BPD, PTSD, and polysubstance dependence. Willette testified that BPD is diagnosed when a patient exhibits five of nine criteria, and that mother displayed eight of the nine. She referred mother to a dialectic behavior therapy (DBT) group, a form of treatment that is used to reduce BPD symptoms by training the client to become more aware of her emotions. It is considered the most effective mental health treatment for persons with BPD. The program lasts a year and most of Willette's clients take it twice.

Mother participated in DBT for seven months before being removed because she was volatile, explosive, and "out of control." She behaved in a threatening manner toward

other group members, had angry outbursts, cursed, and engaged in verbal attacks. Group leaders tried to explain to mother that throwing pens across the table at other group members and continually interrupting and talking over others was disruptive. Because mother was repeatedly unreceptive to those interventions, she was finally asked to leave. According to Willette, mother learned nothing from the group, gained no insight, and made no progress whatsoever.[6]

Ewell performed another evaluation of mother at the same time that mother began her DBT group with Willette, in May 2002. He did not alter his prior diagnoses of ADHD, PTSD, and borderline, antisocial, and narcissistic personality disorders, but added a diagnosis of cannabis abuse. Ewell noted that mother continued to exhibit significant mood volatility, impulsivity, and exaggerated responses to stress. He concluded that she remained a "significantly maladjusted individual" who lacked insight into her children's needs. He expressed "grave doubts" regarding her ability to provide the boundaries and structure needed to protect the children from harm. Moreover, he doubted that mother would be able to accomplish the changes necessary for her to become a minimally adequate parent within the limited time typically imposed in termination cases, because she needed several years of ongoing services.

This brings us to the end of 2002. It appears that mother did not engage in any form of drug or mental health treatment for most of 2003. By November 2002, mother was no longer receiving services at ADAPT, and by February 2003 mother was no longer receiving services at DCMH. Additionally, mother's caseworker was unable to track her progress because mother had revoked her treatment releases.

A representative of the Upper Skagit Tribe was working closely with DHS, and was involved with D's foster placement with the Bruces. However, by late 2002, the tribe recommended that D be placed with father, as long as father and mother had no contact and father engaged in services. A

---

[6] Mother testified that she was unsuccessful with the DBT group "not because [she] was [un]willing to learn" but because "being in the same room with [13] people who have [BPD] drove [her] up the wall."

no-contact order was put in place by the court, and father understood that a violation would result in D being returned to his placement with the Bruces. D was returned to father's custody in November 2002.[7]

Immediately after D's return, however, mother moved into the household. The DHS caseworker suspected that mother and father were having contact but could not confirm that suspicion for nearly six months, at which point D was removed and returned to the Bruces' home. From that point forward, father has had very little contact with DHS and has not participated in any visits with D. The record reveals little about what happened for the rest of 2003, except that mother admitted to smoking methamphetamine and filed a second restraining order against father. Mother testified that her relationship with father ended at that time.

That brings us to the third identified time period, consisting of the final two years before the termination trial (which began in September 2005 and concluded in November of that year). As we have noted, mother accomplished some changes during that final time period. Most significantly, mother moved to Portland and completed a nine-month residential drug treatment program at Comprehensive Options for Drug Abuse (CODA), which she started in January 2004.

Mother initially had some difficulties at CODA. For example, she changed counselors soon after she arrived due to conflicts with her first counselor. Also, mother was nearly terminated from the program once or twice due to poor "interpersonal relationship skills." Nevertheless, mother's counselor noted that mother made significant progress in managing her emotions and in her interpersonal relationships, and mother's UAs at CODA were clean. Mother's discharge record, assessing her emotional behavior, indicates that she entered the program at a rating of "5," that is, "[v]ery serious adverse impact on recovery," but left at a "2," meaning "[l]ow adverse impact on recovery." It also indicates that mother had "developed relapse prevention skills and [had] made great progress with emotional management skills."

---

[7] Although it is not entirely clear from the record, it appears that mother voluntarily relinquished her parental rights to J at about that time.

Because the CODA program did not have a mental health component, mother also attended Cascadia Behavior Health Care, a mental health treatment facility. Her counselor, Wendy Bauman, testified that mother completed a two-month coping skills program. Bauman then referred mother to another DBT group, not because Bauman "notice[d] any emotional instability or difficulty [in mother]," but because a previous evaluation had recommended it. Mother attended only two DBT meetings, and then switched to individual sessions with Bauman to "check[ ] in" regarding how her drug treatment was going and talk about her education and employment goals and visitation with D. Mother reported to Bauman that she did not want to return to methamphetamine use, but did plan to resume using marijuana, because it helped her to relax and "she * * * didn't feel there was anything wrong with that." Mother's last session with Bauman was in October 2004, the same month that mother completed the CODA program. At that contact, mother was "pretty stable" on her medications (an antidepressant and a mood stabilizer), and Bauman did not see an "overwhelming need" for her to continue with mental health counseling.

Dr. Robert Basham, a clinical psychologist, evaluated mother twice, at the beginning and at the end of her nine-month residential treatment program at CODA. Mother requested the first evaluation because she felt unfairly labeled by prior evaluations. However, Basham reached a diagnosis that was similar to mother's prior evaluations: polysubstance abuse, PTSD, and a personality disorder not otherwise specified, with borderline, antisocial, and paranoid features.

Basham performed the second evaluation in order to assess whether there had been any change in mother's psychological functioning and to incorporate review of other background reports, including the evaluations conducted by Ewell in 2000 and 2002. Basham did note some changes in mother, including a significant decline in indications of paranoia and a positive response to medication, which seemed to have mitigated symptoms of a mood disorder. The fact that she had completed the CODA program without major incident demonstrated "a genuine effort and commitment to

making gains." However, mother continued to exhibit borderline and antisocial personality traits, and she remained prone to overreacting to problems, particularly to difficulties in relationships, and to disliking anyone in the role of authority. She also appeared to be less receptive to drug treatment than in her prior evaluation.

Despite the progress that mother had made since her prior evaluations, Basham remained guarded about mother's prospects for long-term success as a parent. He noted that "[m]uch of the question on her future prospects for parenting depends on the likelihood of remaining clean and sober, particularly when she is living in the community without any immediate supervision or accountability." He concluded that there is a "near certainty" that mother's condition would deteriorate were she to relapse, because drug abuse would exacerbate her tendency toward extreme emotional reactions and her borderline and antisocial personality traits. The emotional instability that would result would decrease her awareness and appreciation of D's needs and would interfere with her ability to maintain a stable job or housing. Accordingly, abstinence from drugs would be crucial to her ability to function as a minimally adequate parent to D.

Because mother's personality disorder created a higher risk of relapse, Basham also considered it "crucial" that she participate in a comprehensive aftercare treatment regime, including community 12-step meetings. He expressed concern regarding her lack of involvement in such meetings and her critical and dismissive comments about her current aftercare group. He also recommended that she continue with mental health treatment, and noted that, because mother was resistant to acknowledging the reality of her borderline personality traits, "it would be an important sign of progress for [mother] to come to terms with that and then work diligently on addressing the specific psychological problems that are part of her personality disorder."

In all events, Basham concluded that, as of the date of the evaluation, December 2004, mother was not ready to parent. The "true test" would be for her to maintain sobriety

and stability for about a year on her own, outside the structured setting of a residential program. Because mother's termination trial occurred almost one year after Basham's second evaluation, what mother accomplished during that final year is of critical importance to our review.

DHS was prepared to go to trial at the time of Basham's second evaluation but postponed the trial because of mother's completion of the CODA program. In a letter, DHS outlined the following expectations for mother in order to consider her as a resource for D: that she remain drug free and participate in aftercare as recommended by CODA and Basham; that she submit to random UAs; that she continue in mental health treatment and successfully address the issues outlined in Basham's evaluation; that she complete a parenting class and an anger management class; that she establish and maintain adequate housing; and that she continue therapeutic visitation with D and demonstrate an ability to meet his developmental, emotional, and psychological needs based on his treatment plan. Mother failed to fulfill the majority of those expectations.

To her credit, mother did move into an Oxford House, a self-governing clean-and-sober "halfway" residence where she remained as of the time of trial. Each of the eight residents had her own room, and the rest of the house was shared space. Each resident was assigned chores and responsibilities; mother acted as treasurer, in charge of paying bills for the household. One of the other residents testified that mother is "very emotionally stable," is appropriate in her moods, and has successfully followed through with her job as treasurer.

However, mother did not remain drug free, and her involvement with aftercare was sporadic at best. After completing the CODA program, mother enrolled in an outpatient drug and alcohol group at Cascadia, but missed 10 out of 29 meetings. Her counselor, Don Kangas, classified her attendance as a "failure to attend" and observed that it "certainly [was no] treatment success." Indeed, Kangas had to escort mother out of a couple of the meetings that she did attend because of her emotional volatility. He expressed concern about her ability to maintain control over her emotions,

describing her as overreacting to things and as angrier than the average person.

Moreover, three out of her 11 UAs while at Cascadia were positive for marijuana. Whenever Kangas confronted mother about her drug use, she excused it with the explanation that she was "under so much stress." During those discussions, Kangas reminded mother that custody of D was in jeopardy and that, to ensure his return, she needed to remain clean and sober. However, mother was not able to maintain sobriety during the period that Kangas was working with her. Eventually mother dropped out of the program, claiming inability to pay. Her discharge record, dated June 2005, stated that mother "ha[d] not yet established adequate abstinence," that her "[e]motional stability" was "questionable," that she demonstrated "great ambivalence about treatment involvement," and that mother eventually "disappeared from [the] outpatient treatment program." At trial, Kangas testified that he did not believe that mother had maintained abstinence and that she fit the profile of a person in "chronic relapse."

The record likewise contains no evidence that mother participated in anger management or parenting classes or mental health treatment. Mother did submit to random UAs, but only after nearly being suspended from the UA program for not calling in. In addition to the three positive UAs from Cascadia, mother had positive UAs for marijuana and alcohol in April and August of 2005. The April UA prompted DHS to again proceed to trial to terminate mother's parental rights.

Mother did visit with D, and the visit supervisors reported that mother was always very affectionate and loving with D, giving him hugs and kisses and holding him on her lap. D generally responded well to visits and was eager and happy to interact with mother. D would reciprocate affection when asked. Visit supervisors commented that mother genuinely cares for D, demonstrated concern about his well-being, and tried very hard to make visits positive.

At the same time, visit supervisors expressed concern about mother's lack of insight into D's needs and her resistance to support services. As discussed in detail below,

D has a number of mental health challenges, but mother "minimize[d]" and "overlook[ed]" the mental health difficulties reported to her by other treatment providers. She told one supervisor that D was a "normal kid" with no real problems other than being separated from her. Mother likewise failed to appreciate D's difficulties connecting with her during visits. For example, mother would continually redirect D to other activities prematurely. As one supervisor observed, mother would want D "to play with everything and be around everything. She wants hugs and kisses when he's not ready to give them. She * * * does not read his signs that he gives back to her." She also frequently reacted defensively to feedback or offers of assistance (which were made before or after visits), becoming "highly upset or emotional to the point of yelling or swearing." Mother's attitude varied from "friendly" to "belligerent [and] demanding."[8]

One supervisor reported that mother became very upset during one visit after learning that D had been put on medication, complaining that he was "on F'ing drugs and [wouldn't] even look at her." Mother insisted, "He can't sit still. He's wired." Mother then snapped her fingers several times in a row demanding that D look at her, and demanded to know why D could be placed on drugs and she could not smoke marijuana.

Mother's employment history during the final year before trial was mixed. She did succeed in maintaining a job at Pizza Hut for 10 months and received some positive reports on her performance—but she also received some criticism and had conflicts with her supervisor. She failed to show up for work during the last few weeks of her employment and then quit, claiming that the work environment was abusive. She then worked at a gas station for three months, where she was disciplined for lashing out at customers when she was busy and under stress. Mother quit that job after being suspended from work due to a cash shortfall that the employer eventually determined was not her fault.

---

[8] During this time period, mother had other emotionally charged interactions with DHS employees. The receptionist at DHS reported two incidents when mother was "very upset," "yelling," and "using profanities." The latest of those incidents occurred one month before trial.

Having addressed the relevant facts with respect to mother, we turn the focus to D, who was four years old at the time of trial. Along with ADHD and a communication disorder, D has been diagnosed with a pervasive developmental disorder, not otherwise specified. Pervasive developmental disorder is an umbrella term for a spectrum of neuropsychiatric disorders (including, most familiarly, autism and Asperger's Syndrome) involving atypical communicating, relating, and information processing. Dr. Dane Borg, the psychologist who evaluated D, indicated that, although there are certain characteristics of both autism and Asperger's Syndrome in D's behavioral patterns and cognitive profile, "his symptoms do not fully cluster in either [category]."

Pervasive developmental disorders involve problems in the organization of a child's nervous system that cause atypical patterns of social development and relatedness, language development, sensory processing, mood regulation, and cognitive flexibility. In Borg's words, a child with a pervasive developmental disorder is "hard wired" differently than his typically developing peers. D has difficulty communicating and relating to his peers and tends to isolate himself. He also demonstrates rigid thinking, an extreme intolerance for change, an unbending need for predictability and routine, and intense and excessively emotional tantrums and defiant protests.

D's rigid thinking and difficulty tolerating change are very apparent in his responses to transitions, the unexpected, or even having something "out of place" in a familiar room. When something "new" is coming up, such as a visit to a relative or a doctor's appointment, D needs intensive verbal coaching in order to prevent an "emotional meltdown." As a two-year-old, he escalated into extended tantrums several times a day that lasted up to 45 minutes at a time and involved screaming, object-throwing, and, eventually, bodily rocking and head-banging. As of Borg's evaluation shortly before trial, medication (including Ritalin), combined with "very intensive and attentive environmental prevention of frustration," had resulted in a reduction in the frequency and severity of such incidents, but oppositionality and tantrums were still part of D's day-to-day functioning.

D's foster mother, Bruce, described the importance of D's daily routine:

"We wake up at six-thirty. He has to eat by seven and have his medication. He has to stay on the same routine, have the same place to eat, the same spoon, the same cereal. It takes a half an hour to forty-five minutes to have breakfast. Then we get ready for school and we have about twenty-five minutes to brush our teeth, get dressed and try to get a little movie time in, and then he goes to school until 1:00 o'clock. [He c]omes home at 1:00 o'clock, [and] he needs the same snack, his gold fish, cheese and crackers and raisins and toasted peanut butter. It has to be the same way, laid out the same way every time. Then he takes a nap for up to [an] hour. And then we have afternoon play time * * * until dinner time. And then dinner time [is] another hour ordeal with the same meal. He'll only eat chicken, hamburger, rice and just very few things. And they can't be touching. And there cannot be any outside stimulation. No TV. We draw the blinds even so he can't see outside to get through the meal easier."

According to Bruce, D fights every step of the routine, saying "no" to every bite, for example. It can take 45 minutes not just to feed D but to coax him to eat. Something like having a substitute school bus driver, going to a different store, or the graduation of one of the children in D's class "totally throws him off." He also becomes fixated on things; for example, where another child may ask for an object several times in a row, D "will ask for it three hundred times."

Borg explained that D responds differently than do other children to multiple types of sensory information. He might simultaneously seek out high levels of certain types of information, "be disinterested or under-responsive to others, and be easily pushed into uncomfortable levels of overstimulation," which leads to "more disorganized emotional and behavioral responses." Age-appropriate experiences may be overstimulating for him, and may arouse his nervous system into an "unbearable state of overload." His environment must be strictly structured to meet the needs of his nervous system, a very challenging task.

According to Borg, D's developmental potential will be determined in large part by his environment from this

point on. He will need intensive services and a "sophisticated parenting strategy"—that is, caregivers who are able to understand and appreciate that D responds to the world differently than other children do. His caregivers must be aware that the approaches that one might take instinctively with other children may be counter to D's needs and will need a capacity for ongoing focus on D's behaviors and responses to sensory experiences in his environment. According to Borg, because of their problems relating and communicating, children suffering from pervasive developmental disorders can become more disorganized, confused, and overwhelmed by other people's unregulated, emotionally driven behaviors. He concluded that D needs "to experience placement in a stable home with caregivers who are really committed to him and who are able to provide the kind of structure, emotional nurturing and interaction that he really needs."

At the time of trial, D was receiving services and treatment through a special day treatment preschool. A psychiatrist and a social worker at the program testified to D's behavior and communication difficulties. The medication prescribed by the psychiatrist, Dr. William Sack, appears, by all accounts, to be helping; D is more stable and "seems more relaxed and comfortable." Bruce commented that D's quality of life has improved since being placed on medication and, although she was resistant to the idea at first, she now realizes that he needs it. Sack testified that if D were taken off the medication, his condition would soon deteriorate.

Both Sack and the social worker, Amanda Barnum, concurred with Borg's assessment of D's needs. Barnum testified that he needs a "very mentally stable" caregiver who is willing to continue to learn how to work with his condition. She opined that D's caregivers would need to consistently participate in training and support groups, and would need to constantly work on their own issues arising from a caregiver's own anger and frustration that will inevitably surface as a result of working with a child with such special needs. Barnum expressed the view that, in order to provide adequate care to D, his caregivers would need to be "very strong in their listening abilities and very skilled in their therapeutic parenting." In the future, when D is in public school, his caregivers will need to work extensively with the school, with

special education providers, and with a treatment team. When asked how D would respond to an emotionally unstable parent, Barnum replied:

"That would be * * * very alarming to think about. But if [D] were with someone that was not mentally stable it really would not foster his growth socially, emotionally or cognitively in any way. He needs a solid grounding, [a] trusted caretaker that can be consistent in every way or * * * he would become increasingly more severe in his mental health [problems and] would regress."

For her part, mother is skeptical about those assessments of D's special needs. At trial, she acknowledged that "there's a possibility that he has special needs," but she has not observed them firsthand. She asserted that she is "not comfortable with the idea of him being placed on medication when there's no proper diagnosis for it"; she has seen D's psychological assessments and believes that they do not establish a "need for [him to be on] a Ritalin-based drug." Mother is particularly concerned about Ritalin because "it's amphetamines like I was using[.]" Despite those comments, mother allowed that if she were to regain custody of D, she would keep him on medication if a doctor of her choosing thought it was necessary and "had proof to back it up."

When asked what D needs, mother replied that he needs "attention" and "recognition." She recalled that when she and D were living together, she talked to him and gave him one-on-one time, except when she was on drugs. Mother opined that D's negative behaviors were learned from his foster home and, if he were placed back with her, his behavior would improve or, at least "would [not] get any worse." Mother indicated that she has "no problem" with D receiving therapy and thought it "[m]ore than likely" that she would be able to work with D's treatment providers.

Mother was adamant that she would not use marijuana if D were returned to her. When asked about her recent positive UAs, mother acknowledged that her "drug of choice" was marijuana and that she has a "huge void without [D] in [her] life and probably * * * used pot to try to fill that void." When asked by the judge what would happen if she were to

experience that "void" after D was returned to her care, she replied:

"It is impossible. * * * I have done everything in my power at this point since I've been up in Portland * * * on what I need to do so I can be a good [mother] to [D]. * * * I'm not going to have that problem."[9]

Mother reported that her primary relapse prevention plan is to call her grandmother or her lawyer when she is about to use drugs. She no longer attends any outpatient program because she reportedly cannot afford it, and she does not attend any 12-step meetings. She commented that she "tend[s] to frown about [12-step] meetings because * * * they have no directive" and they tend to "trigger" her; she claims it is "actually safer for [her] recovery for [her] not to go to them."

Mother also denied any current anger issues; although she acknowledged that she "used to" have problems with anger, she claims now that she is "not even the same person" and is "the complete opposite" from before. She reports that she has learned how to control and deal with her anger and that she still gets emotional, but not like she would in the past. Mother believes that she has characteristics of BPD, but does not have it "full-blown."

The juvenile court found that mother's mental illness, coupled with her drug addiction, has resulted in a condition that is seriously detrimental to D and that integration into mother's home is improbable within a reasonable time due to conduct or conditions not likely to change. The court found that mother is an aggressive, assaultive type of borderline personality who continues to use drugs and alcohol and has discontinued services for both conditions. It found that the state had proved beyond a reasonable doubt that mother's *mental illness* presents a "severely negative impact" on her ability to parent D because it makes her emotionally

---

[9] Mother apparently believes that if D were returned, the "void" would disappear. However, according to Willette, mother's chronic feelings of emptiness are a typical symptom of BPD that would not disappear if D were returned. Willette suggested that, although the feelings may subside for a short time, they are certain to return, at which point mother will again be faced with an impulsive desire to use drugs.

unstable and unable to develop insight into his needs. The court likewise found that mother's continued use of controlled substances and her attitude establish that she is unable to remain clean and that the state had proved beyond a reasonable doubt that mother's *drug use* renders her unfit because it impairs her ability to be aware of and appropriately respond to D's needs. Finally, the court found beyond a reasonable doubt that mother had failed to make a sufficient lasting adjustment to enable D's integration into mother's home within a reasonable time, noting that D requires extremely skilled care and that mother cannot provide him with the stable, nonchanging environment and routine that he needs. Additionally, the juvenile court found that mother is unable to effectively follow the advice of D's treatment providers, placing D at further risk. The court summarized:

> "Mother has failed to make the necessary adjustments to allow for the return of [D]. She has completed the [CODA] substance abuse treatment program, but failed to engage in aftercare. She has failed to engage in [12-step meetings.] She failed to complete parenting classes. She failed to complete anger management * * * classes. She failed to complete [DBT] or individual mental health counseling. She has visited with [D] and she has continued living in the Oxford House, but she has not maintained abstinence from alcohol or marijuana."

On *de novo* review, we affirm those findings.

▇▇▇ ORS 419B.504 provides, in part:

> "The rights of the parent or parents may be terminated * * * if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child * * * and integration of the child * * * into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

> "(1) Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child * * * for extended periods of time.

> "* * * * *

"(3)   Addictive or habitual use of * * * controlled substances to the extent that parental ability has been substantially impaired.

"* * * * *

"(5)   Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make it possible for the child * * * to safely return home within a reasonable time or failure of the parent to effect a lasting adjustment after [active efforts[10]] by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

In seeking the termination of a parent's rights to an Indian child under ORS 419B.504, the state has the burden of showing beyond a reasonable doubt, ORS 419B.521(4), that the parent is presently unfit to care for the child. The Supreme Court has observed that both parts of the two-part test contained in ORS 419B.504 must be met before the court orders termination:

"First, the court must address a parent's fitness: The court must find that the parent is 'unfit by reason of conduct or condition seriously detrimental to the child.' That, in turn, requires a two-part inquiry: The court must find that: (1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is 'seriously detrimental' to the child. Second—and only if the parent has met the foregoing criteria—the court also must find that the 'integration of the child into the home of the parent * * * is improbable within a reasonable time due to conduct or conditions not likely to change.' "

*State ex rel SOSCF v. Stillman*, 333 Or 135, 145, 36 P3d 490 (2001); *see also State ex rel Dept. of Human Services v. Smith*, 338 Or 58, 80-81, 106 P3d 627 (2005). Additionally, the court must also find that termination of parental rights is in the best interests of the child. ORS 419B.500.

■      We first address mother's fitness and find that mother's mental illness, coupled with her addiction to controlled substances, constitutes a condition that, beyond a

_____
[10] ORS 419B.500; 25 USC § 1912(d).

reasonable doubt, is seriously detrimental to D. We are mindful that the "conduct or conditions" at issue must have rendered mother unfit at the time of the termination hearing. *Stillman*, 333 Or at 148-49. Even though mother's mental health issues and her drug addiction are intertwined, we begin by addressing her mental illness.

Over the last eight years of involvement with DHS, mother has had a number of psychological evaluations, and each one included a diagnosis of either BPD or characteristics of BPD attached to a personality disorder not otherwise specified. Although there is no cure for BPD, therapy can help a person learn to cope with and manage the symptoms. However, we are convinced that mother has not achieved the ability to manage her illness and that her illness is seriously detrimental to D.

For the last eight years, mother's life has been in almost constant chaos. Her emotional instability is frequently extreme, and she is regularly in conflict with others. She is prone to angry outbursts and violent behavior. People have consistently described mother as threatening, combative, aggressive, and even violent. The record also establishes that she has assaulted a number of people, including her first child, J, and has threatened to assault others. Closer to trial, mother was not engaging in any sort of mental health treatment, and her aggressive outbursts continued. DHS employees testified to a number of outbursts of intense and extreme anger in the six months before trial. Additionally, mother's volatility apparently interfered with her ability to maintain employment.

Also characteristic of BPD, mother currently displays a lack of insight into her participation in the problems she has encountered. For example, when asked at trial why she left her first inpatient treatment facility after five days, mother insisted that the facility offered her no treatment and let her sit idly for five days—yet the testimony of her primary counselor and her discharge record indicate that it was mother who refused to engage in her recovery. Additionally, at trial, mother implied that the violent interaction with her own mother (resulting in the fracture of her mother's skull) occurred because if she had not responded violently, she

would have been injured. Mother reported that she was unsuccessful in a DBT treatment group, not because she was unwilling to learn, but because the other members of the group were too difficult to interact with. Perhaps the most telling example of mother's lack of insight was mother's response when asked whether she felt accountable for D being placed in foster care. Mother had difficulty understanding, and answering, that question: "There [are] things that I don't—maybe have provoked [that caused] him to go into foster care in the first place * * *. * * * I placed him in care * * * when I left Crossroads [but] I was not emotionally stable. I cracked. I mean I sat in [Crossroads] for five days and * * * did nothing. And I just—I just don't know."

■ Under ORS 419B.504, a diagnosis of mental illness is not enough; there must also be evidence that the parent's condition is so seriously detrimental to the child as to warrant a finding of unfitness. *State ex rel Dept. of Human Services v. Huston*, 203 Or App 640, 646, 126 P3d 710 (2006). That statutory requirement is meant to be "child-specific" and calls for "testimony in psychological and developmental terms regarding the particular child's requirements." *Id.* at 657 (citing *Stillman*, 333 Or at 146). For example, "minimally adequate parenting skills may be different for a severely disabled child from those for a child that has no disabilities." *State ex rel SOSCF v. Wilcox*, 162 Or App 567, 575-76, 986 P2d 1172 (1999).

In *State ex rel Dept. of Human Services v. Radiske*, 208 Or App 25, 55-57, 144 P3d 943 (2006), we considered the mother's conditions in light of the child's particular needs.[11] There, the child had been diagnosed with chronic post-traumatic stress disorder, major depressive disorder, a learning disorder and, in general, was a "very fragile" and "unusually troubled" child. *Id.* at 42, 55. Therapists testified that the child "absolutely" needed a calm, predictable, highly supportive home environment with a caregiver who had good emotional control in order for the child to be able to overcome

---

[11] Even though in *Radiske* we considered the child's specific needs during the second step of the unfitness analysis—that is, whether integration into the parent's home was improbable within a reasonable time—the "child-specific" inquiry applies to all levels of the analysis. *Huston*, 203 Or App at 657.

her emotional problems. *Id.* at 42. We concluded that the mother's serious mental illnesses, which were exacerbated by continued marijuana use, made her unable to understand and appreciate the child's fragile emotional state. *Id.* at 50-51, 56-57. We noted that the mother had demonstrated that inability by pressuring the child to testify a certain way at trial, causing the child significant emotional distress, and by being unable to articulate an understanding of the child's specific needs, beyond agreeing to take her to therapy. *Id.* at 56-57. We ultimately agreed with one therapist that the mother's psychological problems and drug use caused her to have an inadequate appreciation and sensitivity to the child's complex special needs. *Id.*

On the other hand, in *Squiers*, 203 Or App at 793-94, we concluded that the mother's borderline personality traits did not interfere with her ability to recognize and meet her children's special needs. There, the two children both had learning difficulties, ADHD, and other special needs. *Id.* at 784-86. The children needed a consistent home environment where they would receive attention and stimulation, and they needed a caregiver who would be a strong advocate for them in the school system and expose them to educational materials at home. *Id.* at 784-86. At trial, the mother was able to persuasively articulate how she would address her children's learning delays and other special needs. *Id.* at 794. For example, she demonstrated an awareness of their need for repetition to assist in the learning process. *Id.* She testified that she would help them learn to communicate better by offering them choices and then teaching them about the consequences of those choices. *Id.* She stated an intention to work closely with everyone who worked with the children and to implement their suggestions. *Id.* Moreover, she had participated in a number of parenting classes that had helped her understand appropriate levels of supervision for the children. *Id.* at 795. In sum, the evidence showed that, despite a personality disorder, the mother displayed insight and understanding regarding her children's special needs.

The record before us is more like *Radiske* than *Squiers*, because the manifestations of mother's personality disorder are directly harmful to D and render her unable to understand, appreciate, and accommodate D's special needs.

We agree with the juvenile court's conclusion that D's needs far exceed any parenting skills of which mother is capable.

As noted, D suffers from a pervasive developmental disorder. As a result, D has problems with social development, communication, sensory processing, and mood regulation. The most prominent manifestation of his disorder is his unbending need for stability and predictability. It is clear from the testimony that D is easily overwhelmed by the slightest alteration in his environment.

Accordingly, the record establishes that minimally adequate parenting for D will involve a "very intensive and * * * sophisticated parenting strategy." It will include the ability both to recognize and accommodate D's needs for stability and patience. Additionally, D's caregivers must be able to advocate for him and work proactively with his service providers; such treatment will include medication management and regular contacts with special education and mental health services. All told, D requires an emotionally stable caregiver with highly developed observation skills, insight, and self-awareness who is able to negotiate the system of service providers.

If D's special needs are not met, his development is at risk. One expert opined that if D were placed with an emotionally unstable caregiver, he would "regress severely in all developmental areas." Another stated that D is more vulnerable to being confused and overwhelmed by other people's emotional displays or emotionally driven behavior, and that such confusion would interfere with his development. In essence, his disorder would become increasingly symptomatic.

Mother's mental illness is seriously detrimental to D. First, the emotional instability that accompanies her mental illness is directly harmful to D. As the experts explained, D is easily overwhelmed and confused by erratic emotional displays. And although all children are affected by their caregivers' reactions to life experiences, those effects may be particularly pronounced for a child like D because he will deteriorate psychologically if his caregiver's behavior is

inconsistent or inappropriate. Mother has consistently demonstrated that she is unable to control her emotional volatility, which would place D at serious risk.

Second, like the mother in *Radiske*, mother's interactions with D and her attitude regarding his illness demonstrate that she is unable to perceive his needs. During visits, the supervisors frequently expressed concern about mother's lack of insight, reporting that she "minimize[d]" and "overlook[ed]" the difficulties that D was having during visitation and that she would overstimulate him by redirecting him too often and too quickly. The record demonstrates that mother interacts with D without regard for his unique sensory experience.

Third, mother's illness makes her unable to accommodate D's needs because she is resistant and unresponsive to D's support services and treatment providers. As she often did in her own treatment, she frequently responds to visitation feedback by yelling and swearing. She testified that she would keep D on medication only if a doctor of her choosing had the "proof to back it up." Indeed, mother herself expressed some uncertainty about whether she would be able to work with D's treatment providers, indicating only that it was "[m]ore than likely" that she could.

Finally, unlike the mother in *Squiers*, mother did not provide any persuasive evidence that she is capable of addressing, or even understanding, D's condition. When asked about D's needs, mother was able to articulate only that he needs "attention" and "recognition." She expressed uncertainty regarding whether D even has special needs at all, despite the fact that she has been repeatedly informed of those needs by professionals, and suggested that D learned his behaviors from his foster family and would improve once he is returned to her.

Mother's drug use is an additional condition seriously detrimental to D because it worsens her personality disorder and makes it more difficult for her to manage her symptoms. Even though mother attended a nine-month inpatient drug treatment program and apparently was sober the entire time, she subsequently has had a total of five positive UAs. She no longer attends outpatient aftercare and her

relapse prevention plan is essentially nonexistent. The discharge summary for her last aftercare program—which ended about four months before trial—stated that she had not established abstinence, her emotional stability was questionable, and she was ambivalent about continuing with treatment.

We agree with the juvenile court's findings that mother has not maintained sobriety and that her drug use seriously complicates her mental health issues. We also concur with the juvenile court's finding that mother's drug use impairs her ability to be aware of and appropriately respond to D's needs and renders her more unstable in her emotions, her employment, her housing, and her relationships. As of the time of trial, mother apparently did not yet realize the importance that her sobriety plays in her ability to manage her mental illness.

Mother contends that the state failed to prove beyond a reasonable doubt that her present condition is seriously detrimental to D. She points to her recent successes over the two years leading to trial—that she completed a nine-month residential drug rehabilitation program, was stable in her employment for 10 months and then for three months, and maintained stable housing in a structured clean-and-sober environment—to show that she has made significant progress. She points to *State ex rel DHS v. Lee*, 194 Or App 633, 96 P3d 823 (2004), and *State ex rel SOSCF v. Armijo*, 151 Or App 666, 950 P2d 357 (1997), for the proposition that, when a parent has made significant progress, termination is improper.

We do not see the same amount of progress here as we did in *Lee* and *Armijo*. In *Lee*, the mother had significantly adjusted her circumstances by obtaining adequate housing, improving her parenting and housekeeping skills, demonstrating improvement in her mental health, and engaging in mental health treatment. 194 Or App at 645-46. Moreover, in *Lee*, there were no drug and alcohol issues, and the mental health issues were less severe than in this case. *Id.* at 639, 643-44. Finally, there was no evidence in *Lee* that the mother's deficits were seriously detrimental to the children. *Id.* at 646.

*Armijo* is more similar to this case in that it involved both substance abuse and mental health issues. *Armijo*, 151 Or App at 668-71. Again, however, the progress achieved by the mother in *Armijo* was more substantial than mother's progress here. In *Armijo*, the mother's mental health improved; she completed a drug treatment program, participated in intensive aftercare treatment, did not relapse, and was on a course of "discipline, stability, and sobriety that was unprecedented in her life." *Id*. at 682-83.

Here, by contrast, mother's successes are more limited. Even after mother completed a nine-month residential treatment program, she relapsed a number of times and has all but abandoned aftercare treatment. Mother is not participating in any sort of mental health treatment, and her BPD symptoms continue to be apparent. We also agree with the juvenile court's findings that mother's recent history with employment and housing indicate instability, rather than stability. In just the year before trial, mother had quit two jobs and was apparently starting a third; she has not yet been able to maintain long-term employment. Additionally, we agree with the juvenile court that mother's housing situation was in jeopardy at the time of trial because of her inability to conform to the rules of the Oxford House and remain drug free. Morever, the children in *Lee* and *Armijo* did not have special needs like those D has demonstrated. Here, mother's emotional instability and her inability to perceive D's significant special needs are an important reason why her condition is seriously detrimental to him.

■        We next consider whether D's integration into mother's home is improbable within a reasonable time due to conditions not likely to change. *Stillman*, 333 Or at 145-46. After considering mother's history, her pattern of treatment and relapse, and the length of time that mother has been given to stabilize her life, we agree with the juvenile court that the state proved beyond a reasonable doubt that it is improbable that mother's condition will sufficiently change within a reasonable time.

First, mother's involvement with DHS has spanned nearly a decade, and she has thus far been unable to establish significant long-term positive changes. Further, we agree

with Basham's assessment that, because mother's problems are so pervasive, debilitating, and prone to relapse, she would need to demonstrate a minimum of a year of substantial and sustained improvements to demonstrate that she has gained control over her problems. Mother was given that year after she completed her nine-month treatment program at CODA—but in that year, she was unable to maintain her sobriety, her BPD symptoms were still in evidence, and she abandoned any form of drug or mental health treatment. At the time of trial, there was no evidence that mother was headed toward sustained improvement; rather, she appears to be at significant risk of more drug use and psychological deterioration. As we said in *State ex rel SOSCF v. Lehtonen,* 172 Or App 584, 594, 20 P3d 210, *rev den,* 333 Or 73 (2001), "[t]he opportunities for a parent to adjust conduct and conditions so as to be a minimally adequate parent simply cannot be unlimited. At some point, the child's needs for permanence and stability in life must prevail." For D, that time has come.

■ The final issue is whether termination is in D's best interests. As noted, D's needs far exceed what mother is able to provide for him. Given D's own mental health problems, his need for stability, consistency, and permanence is particularly pressing. As the juvenile court found, D's present foster home is a stable and caring placement; from all indications, D's foster parents have demonstrated a high commitment to and capacity for addressing his complex needs, and they plan to adopt him. If D were returned to mother, her instability and drug addiction would seriously jeopardize D's development. We are convinced that it is in D's best interests that mother's parental rights be terminated so that D's need for stability can be addressed.

Affirmed.